**Dezso John LOKOS, Petitioner-Appellant,**

v.

**Walter CAPPS, Warden,**
**Respondent-Appellee.**

**No. 79–2771.**

United States Court of Appeals,
Fifth Circuit.

Sept. 18, 1980.

Richard H. Gill, Montgomery, Ala. (Court-appointed), for petitioner-appellant.

Elizabeth Evans Campbell, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before GOLDBERG, GARZA and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

On the night of December 13, 1963 Dezso John Lokos invaded the home of Leonard H. Culpepper, bound him and shot him dead, and dumped his body into a well. Lokos was tried and sentenced by the Alabama court—first to death but then commuted to life imprisonment. Further information about the crime, its repulsive perpetrator, and the 16 year old legal enterprise concerning his disposition, may be found elsewhere.[1] Our concern at this point is the competency of Lokos to stand trial in 1964. We now hold that the constitutional requirements of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), were not satisfied, and we hold that the

---

1. *Lokos v. State*, 278 Ala. 586, 179 So.2d 714 (1965); *Lokos v. State*, 284 Ala. 53, 221 So.2d 689 (1969), *vacated,* 408 U.S. 935, 92 S.Ct. 2854, 33 L.Ed.2d 749; *Lokos v. Capps*, 377 F.Supp. 287 (M.D.Ala.1974), *modified* 528 F.2d 576 (5th Cir. 1976); *Lokos v. Capps*, 569 F.2d 1362 (5th Cir. 1978).

record before the federal trial court establishes that Lokos was incompetent to be tried. The relief sought by the petitioner is finally granted.

## I. THE ALABAMA TRIAL COURT (1964)

The homicide occurred near Linden, Alabama on December 13, 1963. Less than a week later Lokos was apprehended in Texas. He was returned to Alabama and charged with murder in the first degree; the trial was set for February 27, 1964. In advance of trial the appointed attorney for Lokos moved for a psychiatric examination.[2] The Alabama court conducted a hearing on the motion. Four law enforcement officers who had seen and talked to the accused during his confinement testified that they considered him sane. A medical doctor, not trained in psychiatry or psychology, who had talked to Lokos for 30 minutes and who had not considered any of his history of mental illness, testified that Lokos "acted sane" and knew "right from wrong". Lokos himself testified about his history of prior psychiatric commitments and treatments.

Counsel for Lokos offered in evidence a three page letter that he had received from the director of the Winnebago State Hospital of Wisconsin which summarized Lokos' life history, including his institutionalizations, escapes and treatments. The letter advised that the entire record of Lokos was not being reproduced and mailed because it ran well over 100 pages. Highlights of the letter: Lokos entered the state hospital on July 25, 1953 under a mentally ill commitment signed by the judge of Racine County, Wisconsin. He was conditionally released on October 24, 1953 and was returned from conditional release on January 19, 1954. His diagnosis on all admissions was "Schizophrenic Reaction, Paranoid Type" and while in the hospital Lokos received both insulin shock and electro-shock therapy. "During much of the time that he was in the hospital he got along very poorly and had feelings of being persecuted here. After leaving the hospital he continued under the care of a psychiatrist in his home community." Lokos left the hospital on a conditional release in August of 1955. The letter concluded "The long-term prognosis in this case was not very good although there was not very much evidence of an active psychotic process at the time that the boy left this hospital."

■ The state trial judge refused to admit the letter into the evidence and apparently—because it was hearsay—refused to consider it for any purpose. This was probably the determinative error of the trial judge. Indicia of a defendant's incompetence to be tried, sufficient to raise a doubt so as to require the judge to make further inquiry, need not be presented in a formal motion nor argued by defense counsel nor be presented to the judge in the form of admissible evidence. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The Alabama law is in accord. *Lokos v. State*, 278 Ala. 586, 179 So.2d 714, 718 (1965); *Buttram v. State*, 338 So.2d 1062, 1064 (Cr.App.Ala. 1976).

Following the hearing, the state trial judge overruled the motion of the defend-

**2.** The state trial judge treated this request for a psychiatric examination as constituting a motion for the empanelling of a lunacy commission under the Alabama Code of 1940, Title 15 § 425 (now Ala.Code tit. 15, § 15–16–22 (1975)). This court has previously indicated that a motion for a § 425 hearing does not itself place a defendant's competency in issue, and that a § 425 hearing, which is a threshold inquiry to alert the court to the desirability or necessity of examination into defendant's competency to stand trial, is not, itself, an adequate determination of competency. *See Lee v. Alabama*, 386 F.2d 97, 106 (5th Cir. 1967) ("It is plain that this section does not expressly require any determination by the lunacy commission as to the mental capacity of the accused person, already under indictment in a capital case, *to stand trial*"); *Seibold v. Daniels*, 337 F.Supp. 210, 214 (M.D.Ala.1972) ("while a determination under Section 425 . . . of a defendant's present criminal responsibility may include a determination of his competency to stand trial, such cannot be necessarily concluded as a matter of law"); *Davis v. Alabama*, 545 F.2d 460, 464 n.13 (5th Cir. 1977).

ant and said: "The court is not satisfied from the evidence submitted that the defendant was insane or that there is sufficient evidence presented to the court to even indicate insanity."

When the trial began a week later, counsel for the defendant again asked that there be examination by an expert of the defendant, and the letter from the superintendent of the Wisconsin state hospital was again offered. The trial judge allowed the letter to be identified and included in the record but would not allow it to be read or admitted into evidence, saying "It is the same letter which has been heretofore presented to the court in another matter, and the court is familiar with it." The judge further overruled the motion for the appointment of a psychiatrist to examine Lokos.

## II. CONSTITUTIONAL GUARANTEES

### A. The Substantive Right

■ Constitutional due process requires that trial of an accused may be conducted only when he is legally competent. *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court wrote that the test for determining defendant's mental competency depends upon:

[W]hether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceeding against him. *Id.* at 402, 80 S.Ct. at 789.

One who has been convicted may collaterally attack that conviction by proving his incompetency at the time of the trial by a preponderance of the evidence. He is entitled to an evidentiary hearing for that purpose when he makes a showing by clear and convincing evidence to raise threshold doubt about his competency. *Zapata v. Estelle*, 585 F.2d 750 (5th Cir. 1978).

### B. The Procedural Guarantee

■ State procedures must be adequate to insure the right to be tried while compe-

tent. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). A court must *sua sponte* conduct an inquiry into a defendant's mental capacity if the evidence raises a bona fide doubt as to the defendant's competency at that time. *Id.; Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

A "*Pate* violation is a procedural error by the trial court and it may occur only in the time frame encompassed by the trial itself and immediately related proceedings. . . It is always open for the defendant to later assert his actual incompetence at trial in a subsequent collateral proceeding, but the substantive claim should not be confused with a defendant's procedural rights under *Pate* to a hearing whenever a bona fide doubt as to competence surfaces at trial." *Reese v. Wainright*, 600 F.2d 1085, 1093 (5th Cir. 1979); *Zapata v. Estelle*, 588 F.2d 1017 (5th Cir. 1979).

■ The habeas corpus petitioner's burden to prevail on a *Pate* violation is different from the one stated above for the substantive claim. The complaint that a *Pate* procedural guarantee was violated is that, in the light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial. *Drope*, 420 U.S. at 174, 95 S.Ct. at 905. The test is an objective one. *Pedrero v. Wainright*, 590 F.2d 1383 (5th Cir. 1979). The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense. "While the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency procedure, it has focused on three factors that should be considered: the existence of a history of irrational behavior, defendant's demeanor at trial, and a prior medical opinion." *Chenault v. Stynchombe*, 546 F.2d 1191, 1192–93 (5th Cir. 1977), *citing Drope*,

420 U.S. at 180, 95 S.Ct. at 908. Even one of these factors, standing alone, may, in appropriate circumstances, be sufficient— "the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180, 95 S.Ct. at 908.

■ If it is decided in the collateral attack that the original trial court committed a *Pate* violation, the question then becomes whether a hearing can now be adequately held to determine retrospectively the petitioner's competency as of the time of his trial. If the state does not convince the court that the tools of rational decision are now available, the writ should be granted. If a meaningful hearing can be held nunc pro tunc, then it proceeds with petitioner bearing the burden of proving his incompetency by a preponderance of the evidence. *Martin v. Estelle*, 546 F.2d 177 (5th Cir. 1977); *Lee v. Alabama*, 386 F.2d 97 (5th Cir. 1967).

### III. PROCEEDINGS IN THE FEDERAL DISTRICT COURT

During the three occasions when this case has been before the federal district court it has considered both the substantive and procedural contentions of petitioner Lokos, and it has rejected all of them. The district court concluded that the Alabama state trial court complied with procedural due process and that no bona fide doubt was raised of the competency of Lokos to be tried. The inquiry made by the Alabama trial court was, in the view of the district court, a reasonable one; and the constitutional requirements were satisfied and no further investigation or hearing needed to have been made.

The federal judge further held a hearing in 1977 on the substantive question of whether or not Lokos was competent when he was tried in 1964. In addition to the record of the proceedings before the Alabama court, considered also on the procedural question, the federal judge heard additional testimony and then found that the petitioner Lokos: (1) failed to present probative evidence to raise a substantial doubt as to his competency to stand trial, (2) failed to prove that he was incompetent or that there was any substantial question that he was incompetent, and (3) failed to prove by a preponderance of the evidence that he was incompetent to stand trial.

We disagree and hold that there were both procedural and substantive infractions in the Alabama trial court.

### IV. THE PROCEDURAL (*PATE*) VIOLATION

■ As stated above, the state trial judge heard testimony by Lokos of his prior psychiatric commitments and saw the three-page letter from the director of the Winnebago state hospital which summarized Lokos' life history, including his institutionalizations, escapes and treatment. Juxtaposed to this disturbing picture was only the testimony of the peace officers who considered Lokos sane, and the testimony of the medical doctor who after a brief examination saw no abnormality.

The Chief Justice stated in *Drope* that, under appropriate circumstances, the existence of any one factor—the existence of a history of irrational behavior, defendant's demeanor at trial, or prior medical opinion—could be sufficient to trigger a *Pate* inquiry. While Lokos' demeanor and testimony discussed below might not have prompted the trial judge to investigate further, Lokos also presented a history of mental illness, suffered learning disabilities as a child as well as an inability to adapt to his social environment, and experienced a series of commitments to a mental institution where he underwent electro-shock and insulin shock therapy. Although Lokos was conditionally released under a physician's care after a two year commitment, which included prior escape attempts and one prior unsuccessful conditional release, Lokos left his physician's supervision without either notice or permission and wandered about the country for several years in what was characterized as an essentially "nomadic" existence, which ended with his arrest in this case.

Had Lokos' life been marked by a period of normal, adaptive behavior, the trial court would perhaps have been entitled to accord less weight to the evidence of his prior mental illness. *See Carroll v. Beto*, 421 F.2d 1065 (5th Cir. 1970). Unlike other instances in which relief has been denied, *see, e. g., Grissom v. Wainright*, 494 F.2d 30, 32 (5th Cir. 1974), in this case there were specific and repeated requests by counsel for a psychiatric examination.

We see the explanation for the error of the state trial judge to be, primarily, his ignoring the letter from the Wisconsin institution. Furthermore, our reading of his comments leads us to doubt that he focused upon anything but the criminal responsibility of Lokos at the time of the offense. He had at hand the means of further investigation into the history of the mental illness of Lokos and a substantial signal that this illness had been a very severe one.

The Alabama judge had before him the bizarre behavior of Lokos and his highly unusual testimony at his trial. As Lokos detailed his exploits with his three confederates, his lingering annoyance at the younger member (Edwards) of that quartet seems to have overridden perception of his own involvement in the murder of Leonard Culpepper and his predicament before the listening jurors.

> He and Edwards feuded over a dog:
> Lokos: "I had been feeding it on a bottle and eye dropper and all that. I took this dog all along where ever we went, and what is that kid's name again?
> Defense Attorney: Edwards?
> Lokos: Yes, Edwards. Edwards said—we had a fight over that. He said, "You can't treat that dog that way." I told him it was my dog and I'd treat it the way I wanted and, "You keep your paws off of it unless you want to get hurt or something." So he left me alone, but all the time he was always raising hell, and all the three other people that were involved will prove that. They'll say it, and I know they will, and it's the truth that we always argued. . . .

He did not try to impress the jury favorably:

> Lokos: ". . . we wound up at the church, behind the church. We fried chicken and all kinds of meat we got from the last place in Oklahoma. They had a heater in there, and we slept there that night and started running around the next morning. Edwards wanted to go again. He said, "I feel like raiding." I don't know how he could feel like it, but that's what he said. Shucks, anyhow, we went riding around and go by the well and all that, and I don't know who in the devil mentioned it, but somebody mentioned that the well would be a good place to throw them in. I don't know if it was me, and we all agreed we was going to look around for some place to rob. The food was getting low again. I wanted to rob the church house, and Eaton agreed. He said that was a grand idea; when the people came walking in, just take their money and thank you and, you know, be real nice about it. If we had to shoot to get the money, we'd have to shoot everybody.

Then he told the jury about his handling of the man he was about to kill. Culpepper was gagged and bound with strips of towel as Lokos took him from the kitchen of his home out to the back seat of his car. In his narrative he told the defense lawyer:

> Lokos: "Any how, I took him out in the car, and I told him he'd better not make any move or else, and he kept on jerking around and his movements were so slow, so irritating. I mean you ask him to move over and man, he looked like he was dying or something. Well any how that was irritating the hell out of me.

The prosecutor asked him later about that:

> Q. But you had a rifle on him; you had charge of him? Now then, in his tied condition, while he was tied up, did Mr. Culpepper offer any resistance to you?
> A. Yes. He was a slow moving slob. When I told him to move, he dragged his butt.
> Q. And when he did, that made you mad, didn't it?
> A. He went too damn slow.

That testimony, without more, could mean that Lokos was a very bad man. Or it could mean that he was pretending to be insane or incompetent. But adding it to the information given in the letter from the Wisconsin hospital gave a picture strongly indicating insanity and incompetency.

Taking all of this together, we find that sufficient information was available to the state trial judge to have raised a bona fide doubt as to Lokos' competency and to have necessitated further inquiry.

## V. INCOMPETENCY IN FACT

### A. The Record

A minimal investigation in 1964 would have led the state court to Dr. Glenn Bacon and the contribution which he subsequently gave in the hearing before the federal trial court in 1977. Dr. Bacon was the psychiatrist who saw Lokos in weekly psychotherapy from August until December of 1955 following discharge of Lokos by the Wisconsin hospital—which discharge was conditioned upon continuation of care by Dr. Bacon. He was fully familiar with history, treatment and diagnosis and saw Lokos personally until the Lokos family moved to Chillicothe, Ohio. His last correspondence

was in October of 1958 when the father of Lokos asked for a prescription of medication for his son's mental illness.

Dr. Bacon explained to the federal court in 1977 that a person in Lokos' condition "lives in a completely different world than most of us and that what he does he does for different reasons, and what he feels about what he does is entirely different from the way we would feel about what we would do." It was the opinion of Dr. Bacon that the psychotic state of Lokos "would have affected his ability to assist his counsel in the defense of the charge of murder against him." When asked: "Do you have an opinion whether or not he could have effectively and realisticly [sic] assisted his counsel in his defense?" he answered, "No, sir, I don't feel that he could have."

Dr. Bacon's testimony was very positive. Predicated on his personal knowledge of Lokos and the history of what occurred in the time following that personal observation, insofar as that history is known to any of us, there was no question to Dr. Bacon but that Lokos was insane and incompetent in 1963 and 1964.[3]

Two other specialists testified in the federal hearing. Doctor Stickney, a psychia-

---

3. Testimony of Dr. Glenn Bacon:

Q Can you tell us what it was that Mr. Lokos was committed to Winnebago Hospital for as a psychiatric problem?

A His thinking and behavior was so bizarre that it was felt that he should be hospitalized there.

Q Was there any history of any violence or any antisocial acts of a violent nature?

A Yes, sir. He had been quite hostile towards his parents, most especially his mother.

Q Do the records reflect what the nature of the diagnosis of his problem was, what the name of the condition is?

A He was diagnosed as a schizophrenic reaction of a paranoid type.

Q Can you define for me what a schizophrenic reaction of a paranoid type is or how it is manifested?

A A schizophrenic reaction is a most severe form of mental disturbance in which the individual breaks completely with reality to such an extent that he lives in a world entirely of his own. But with the paranoid aspect of the illness, the individual feels that all of the troubles, difficulties that arise from this state are due to other individuals and he blames them for it.

Q Is there any further diagnosis made as to the degree of impairment there?

A The impairment is considered severe.

Q Does that correspond with your own recollection of this man's condition?

A Yes, sir, it does.

Q Could you give me, without his entire history since it will be there in the form of records, just give me some examples from his history of the kinds of rejection and difficulties that you have referred to in terms of adjustment and stress?

A Well, this boy was born in Hungary in 1937 immediately before World War II and was adopted by his foster parents while he was still in Hungary. He had all of the difficulty that occurred, I am sure, for most of the people living in this country, as far as the Natzi [sic] occupation and all the attendant horrors that went with this. But here, not only did he feel that he was rejected by his real mother but he was never able to get along very well with his foster mother. And he felt that she was extremely ill-tempered toward him and extremely demanding toward him, so that he just developed a

Note 3—Continued

hatred for her, so that he had never really developed a feeling of love and affection for his mother or all of the female archetypes that develop from the affection one develops towards one's mother.

Q Do the records reflect what in fact his natural mother, or how he came to be separated from his natural mother?

A No, sir. Not that I have come across here. He was rejected by them to the extent that in the country as—well, shall we say as conservative as that country and Catholic as that country is, I feel actually putting a child out for adoption would be a very unusual sort of thing.

Q Do the records indicate that he was put up for adoption by his natural mother?

A Yes, sir, it does.

Q In terms—you mentioned a moment ago about his being unable to establish a normal relation of affection with his foster mother. Do the records reflect in fact any actual physical assault upon his foster mother?

A Yes, sir, they do.

Q One of the records that I have reviewed states there was at least on one occasion a sexual assault by him on his foster mother. Do you recall that from the records?

A I don't recall it personally from my records of him, but I do remember seeing that somewhere in the voluminous notes that we have here.

Q Is a sexual adjustment part of a characteristic, or sexual maladjustment, I guess, part of the characteristics of the schizophrenic pattern?

A Yes, sir.

. . . .

A Well, in electroshock treatment one passes a very low amperage current through the brain, most especially the frontal lobes. The individual is asleep and does not feel what is happening. Theoretically the passage of the electricity stimulates the production of neurohormones that are in a state of disequilibruim [sic] producing the illness, but becomes manifest as a result of electricity somewhat rational. It is necessary as a result of the electric shock treatment is a loss of memory, and hopefully a loss of the false ideas that is characteristic of the illness. Insulin shock treatment or insulin coma treatment would produce basically the same effect as electroshock treatment except that the results were much more drastic and much more severe, and it was certainly a very, very dangerous form of treatment. I don't believe it is used to any extent if at all at the present time.

Q How would you characterize either or both of those in terms of whether or not that is a mild treatment, a customary treatment, a radical treatment or what, in terms of the patient?

A At the present time it would be considered a rather drastic treatment. At the time, it was the only treatment.

Q Do you know whether or not Mr. Lokos was subjected to either or both?

A I gave him both electroshock and insulin shock.

Q In your opinion, did either of those operate to cure his condition?

A No, sir, they did not.

Q Do you know from the records whether he was also given those treatments again at Winnebago?

A I don't recall these being given to him again at Winnebago, which would be—yes, he was given insulin therapy again. He was given insulin therapy before I saw him at Winnebago, and then he was discharged home and I gave him both insulin coma and electroshock therapy. And then he went back to Winnebago and he was given another course of insulin coma, and I don't remember—yes. He was given electroshock treatments as well as insulin coma at Winnebago before he was discharged home the first time and came back to see—came to see me, at which time I gave him a course of electroshock and insulin coma here at St. Luke's Hospital. He then went back to Winnebago and was given another course of insulin.

Q Was he ever placed also on Serpasil?

A Yes, he was placed on Serpasil, too.

Q And you say that is not used anymore because of it's [sic] relative impotence?

A That's right, sir.

Q You have indicated that schizophrenia is not curable but is treatable. What is the goal of treatment, then, if it is not a cure?

A One would hope that by treatment with the modern drugs one could so modify the individual's thinking that his behavior could become sufficiently socially acceptable that he would be able to exist outside of an institution.

Q When you last saw Mr. Lokos was he suppose [sic] to be taking Serpasil then?

A Yes, sir, he was.

Q Did you release him or did he just fail to come back after?

A I referred him to Winnebago hospital.

Q Does a schizophrenic of a paranoid type, if untreated, what is the expectation as to whether or not he will experience any psychotic episodes?

A I feel that the untreated paranoid schizophrenic can only deteriorate and one would expect him to go progressively downhill.

Q Well, I used the word psychotic. Is schizophrenia of the paranoid type a psychosis?

A Yes, sir, it is.

Q Would you define for me what a psychosis is as opposed to some other form of mental disturbance?

A A psychosis is the most severe form of mental disturbance in which the individual's entire thinking and behavior is domi-

trist and former commissioner of mental health for the state of Alabama, examined Lokos on two occasions and studied the history of his illness and treatment. He agreed with the diagnosis and with the prior opinion that the impairment of Lokos by the mental illness was severe. It was his opinion that the degree of impairment of

Note 3—Continued

nated by the illness, as contrasted to a neurosis which only partially is the case. I mean, an individual, for example, that might be afraid to be seen in crowds but is capable of being out by himself and working by himself and so forth would be neurotic, whereas an individual that would be afraid to have anybody at all look at him would be classically a psychosis.

Q  And this may be repetitive, but was Mr. Lokos neurotic or psychotic?

A  He was continuously psychotic except for those periods of time when he was deficient as far as memory and thinking were concerned as a result of the electroshock and the insulin coma that he was receiving.

Q  When those periods wore off, so to speak, did he return to a psychotic state?

A  Yes, sir, he did.

Q  All right.  Do you have an opinion, if that is so, as to whether or not he would have returned to a psychotic state at least on what you knew of him up until that time?

A  I can almost assure you that he did.

Q  Doctor, I will ask you to assume that following the time he left Winnebago he spent some time simply wandering about the country and eventually joined a number of carnival workers and that in—

(Discussion off the record)

Q  That on or about December 13, 1963, while accompanied by three other carnival workers he reached West Alabama where he has been accused of and convicted of the crime of murder, of having shot an elderly man and having clubbed his wife and put the two of them in a well.  Based on the history and your familiarity with him and the nature of his disorder, and asking you to assume that we have no information as to any intervening treatment after he left here, do you have an opinion whether or not he would have returned to a psychotic state by December, 1963?

A  Yes, sir, I feel he would have.

Q  Doctor, do you have an opinion to a reasonable medical probability as to whether or not he would have been in a psychotic state at the time of the commission of the crime I have described to you?

A  Yes, sir.

Q  Can you state that opinion, please?

A  I feel that he would be in a psychotic state at the time he committed the crime.

Q  Doctor, if he was in a psychotic state as a result of his schizophrenic/paranoid mental illness, do you have an opinion as to whether or not in the commission of this crime he could have distinguished between right and wrong in the commission of that crime?

A  I feel that a paranoid schizophrenic lives in a completely different world than most of us and that what he does he does for different reasons, and what he feels about what he does is entirely different from the way we would feel about what we do.

Q  Let me ask you to interpret a little bit.  Is that true of moral concept such as right and wrong in determination of his viewing it in a different way than people who are not mentally ill?

A  Most definitely, sir.

Q  Doctor, he was arrested fairly shortly after this crime and charged in the Circuit Court of I think Marengo County, Alabama where counsel was appointed to assist in his defense.  And I will ask you whether or not you have any opinion, again, assuming that there has been no intervening treatment after his arrest, whether he would have continued in a psychotic state up until the date of trial?

A  Yes, sir, I feel he would.

Q  And do you have an opinion whether or not that psychotic state would have affected his ability to assist his counsel in the defense of the charge of murder against him?

A  I feel that very definitely it would.

Q  Can you tell me in what way, whether or not it would have—well, let me withdraw that.  Do you have an opinion whether or not he could have effectively and realisticly [sic] assisted his counsel in his defense?

A  No, sir, I don't feel that he could have.

Q  And in your judgment, is that a product of his mental illness, that is,· his mental illness is the reason why he could not have effectively and realisticly [sic] assisted his counsel?

A  Yes, sir, I do feel that is the case.

Q  Let me go back to other elements of his arrest.  Would, in your opinion, or do you have an opinion as to whether or not the stress or the excitement or simply the fact of having committed the crime of murder and being arrested and being tried, would that produce stress that would have any effect on his mental and emotional state?

A  I feel that he would have withdrawn into a complete paranoid schizophrenic withdrawal to such extent that reality for him would be an entirely different thing than it would be for most of us.

Lokos in 1977 was still severe but not the same as it had been since he was no longer in a state of acute psychosis. "He has some of the remaining thinking and affective disorders that go with the schizophrenia but he certainly is in far better shape than he was in 1954." It was his opinion that the psychotic state of Lokos continued through the time of the commission of the crime and his trial.[4]

The third expert witness at the federal hearing, Dr. Warren, was a clinical psychologist. He had also examined Lokos and the medical history. It was his opinion that at the time of the federal hearing Lokos was a sociopathic personality rather than a psychotic. When asked whether he had an opinion as to whether Lokos was psychotic in 1963 and 1964, he said that he was unable to give an opinion because he lacked sufficient data to make a diagnosis as of that time. At another point in his testimony, he expressed an opinion that Lokos was not psychotic in 1963 and 1964 although he did not explain the reason for that opinion and specifically said that he had insufficient data to say either that Lokos was or was not psychotic.

### B. Review of the District Court's Competency Holding

The scope of our review of the trial court's determination on the substantive question, of whether Lokos was competent to stand trial in 1964, is a mixed one. The question of whether or not he suffered from a clinically recognized disorder or psychosis is a question of fact, reviewed by the usual clearly erroneous standard. If we decide that the evidence requires a finding of that mental disorder, then the further decision

as to competency or incompetency is a matter upon which the appellate court assumes a greater decisional role and takes a "hard look" at the record. *Bruce v. Estelle*, 536 F.2d 1051, 1060 (5th Cir. 1976).

We must hold that the finding that Lokos was not suffering from a clinically recognized disorder in 1964 was clearly erroneous. Dr. Bacon knew far more about the matter than anyone else, and he was very positive of the fact. Dr. Stickney was satisfied by what he had been told and had observed that this was the fact. Dr. Warren was undecided.

The only evidence that could be said to be contrary to the determination that Lokos was then psychotic was the demonstration that he could respond to questions in conversations with police officers or on the witness stand, and the testimony of the medical doctor and the peace officers who had observed him and saw nothing abnormal. The nature of Lokos' condition was such that he was able to understand questions and respond to them. One need not be catatonic, raving or frothing, to be unable to understand the nature of the charges against him and to be unable to relate realistically to the problems of his defense. Having the benefit of his medical history in 1954 and 1955 together with the opinion of one of his treating doctors as well as an additional psychiatrist who examined him in 1977, we regard the unnatural testimony he gave to the jurors who were in the process of deciding his fate as being indicative of one who is not operating in the world of reality. The testimony of the lay witnesses before the Alabama court was not of value because they had lacked

---

4. When asked to describe the effect of the psychotic condition from which Lokos suffered upon his ability to distinguish right from wrong, Dr. Stickney said: "Well, I think one way to approach that question is from his own description of his illness as an adolescent and the effect of Serpasil, put together with his description of the events leading up to the crime; I think this man's perceptual and conceptual processes tend to accelerate to the point where he can't—he can't swim out of his own confusion. He doesn't know exactly what

is going on. He may just do what impluse [sic] dictates or what he is told to do, which incidently is his description of what happened at the time of the crime, and he may also very much underestimate or over estimate the danger that he is in because he perceives himself to be surrounded by enemy anyway, and he may very much underestimate or over estimate the seriousness of what he is doing. In other words, his judgment is not detached in any sense and it is very much impaired by the force of his emotion."

prolonged and intimate contact with Lokos. *United States v. Gray,* 421 F.2d 316, 318 (5th Cir. 1970). We conclude that on this

5. We assume that the federal court in 1977 held a meaningful and adequate hearing to determine retrospectively the competency of Lokos as of February 1964. This is a preliminary question that arises in cases where the trial court has violated the procedural guarantee of *Pate v. Robinson* —as we have held was the case here. The state bears the burden to show the court that the tools of rational decision are available. *See Martin v. Estelle,* 546 F.2d 177 (5th Cir. 1977) (holding that the state court failed to afford the accused a full, fair and meaningful competency hearing prior to the trial for murder, and the federal trial court must do so if practicable to make retrospective determination); *Martin v. Estelle,* 583 F.2d 1373 (5th Cir. 1978) (remanding again to the trial court because it failed to make the initial determination of whether meaningful determination could be made nunc pro tunc); *United States v. Makris,* 483 F.2d 1082 (5th Cir. 1973) (question of competency to stand trial raised and case remanded for nunc pro tunc decision if, as must be decided preliminarily, this could be done meaningfully); *United States v. Makris,* 398 F.Supp. 507 (S.D.Tex.1975) (trial court decision explaining ability to conduct a meaningful hearing nunc pro tunc); *United States v. Makris,* 535 F.2d 899 (5th Cir. 1976) (explaining the justification for the retrospective determination 2½ years after the trial); *Lee v. Alabama,* 386 F.2d 97 (5th Cir. 1967) (remanding to the district court to make the nunc pro tunc decision if it could be made meaningfully 24 years after the state trial); *Lee v. Alabama,* 291 F.Supp. 921 (M.D.Ala.1967) (trial court opinion holding that sufficient data was available and meaningful nunc pro tunc determination made), *aff'd,* 406 F.2d 466 (5th Cir. 1968), *cert. denied,* 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969).

The Supreme Court has emphasized the difficulty of determining competency six years after the time of the trial. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). And even one year later. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). There have, however, been a number of cases in this circuit where we have held that sufficient contemporaneous expert examination and data from the date of the trial were still available to warrant an adequate and meaningful determination at much later dates. *Lee v. Alabama,* 386 F.2d 97 (5th Cir. 1967) (24 years); *Carroll v. Beto,* 446 F.2d 648 (5th Cir. 1971) (22 years); *Bruce v. Estelle,* 536 F.2d 1051 (5th Cir. 1976) (eight years); *Martin v. Estelle,* 546 F.2d 177 (5th Cir. 1977) (five years).

Since the federal district court below held that there was no *Pate* violation by the state

record it has been established that Lokos was not competent to stand trial in February of 1964.[5]

court, the federal court has not expressly said that a meaningful determination can be made now (or in 1977) of competency as of the time of the state trial. It did hear testimony in 1977 on the ultimate issue of competency and ruled that the petitioner failed to prove incompetency. The federal court did more: it found that Lokos was "sane" at the time of the offense and at the time of the trial. If that holding does not include, implicitly and necessarily, the preliminary determination of meaningfulness, at this late date in the sisyphean struggle we will not postpone the decision further by remanding again to the district court.

We find no discussion of the problem of a federal court determining that a present hearing cannot adequately decide retrospectively the competence or incompetence of petitioner on the date of the early trial and then, after decreeing a conditional grant of the habeas corpus writ, admitting the state to proceed to retry the accused and, possibly, convict him and determine that he was sane at the time of the offense which preceded the date of his earlier trial. One might assume that the determination of sanity at the time of the offense would be a more difficult question than the determination of competence to be tried thereafter. No court has suggested that when the writ is granted under these circumstances the state is not free to retry the accused, when he is competent to be retried, and to have an insanity defense decided as in any case—as if the federal court had not solemnly decided that no meaningful decision could now be made as to the earlier mental competence of the accused.

A problem that has been considered is whether the retrial of an accused when he becomes competent after a long delay due to his prior incompetence violates due process on speedy trial grounds. This circuit has held that such a delay does not violate Sixth Amendment speedy trial considerations. *Howard v. United States,* 261 F.2d 729 (5th Cir. 1958). *Accord, United States v. Cartano,* 420 F.2d 362 (1st Cir.), *cert. denied,* 397 U.S. 1054, 90 S.Ct. 1398, 25 L.Ed.2d 671 (1970) (short delay of 3 months due to incompetency not violative of speedy trial right); *United States v. Davis,* 365 F.2d 251 (6th Cir. 1966) (9½ month delay in which trial had not begun does not violate right to speedy trial); *Johnson v. United States,* 333 F.2d 371 (10th Cir. 1964); *Germany v. Hudspeth,* 209 F.2d 15 (10th Cir. 1954) (2 years and 9 months not violative of speedy trial right); *Daniels v. Johnston,* 328 F.Supp. 100 (S.D.N.Y. 1971) (8½ year delay did not violate speedy trial right). *Contra, Williams v. United States,* 250 F.2d 19 (D.C. Cir. 1957) (a 7 year delay between defendant being adjudged incompetent to stand trial and his retrial violated Sixth

The only conclusion that we can reach from this record is that the mental condition of Lokos in February of 1964 prevented him from effectively consulting with his counsel and rationally understanding the proceedings. The conditional order to issue the writ does not, of course, prevent the civil commitment of Lokos or other lawful custody apart from this particular criminal charge. *See* Ala.Code tit. 22, § 22–52–37.

The judgment of the district court is therefore reversed and the case is remanded with directions that the writ of habeas corpus be issued, subject to the right of the state of Alabama to retry petitioner within a reasonable time.

REVERSED WITH DIRECTIONS.

Amendment right to speedy trial); *United States ex rel. Wolfersdorf v. Johnston*, 317 F.Supp. 66 (S.D.N.Y.1970) (20 year old state indictment); *see also Dickey v. Florida*, 398 U.S. 30, 39, 90 S.Ct. 1564, 1569, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring); Gobert, *Competency to Stand Trial: A Pre- and Post-Jackson Analysis*, 40 Tenn.L.Rev. 659 (1973); *MESS AGE(S) *MORE SECTIONS FOLLOW Kaufman, *Evaluating Competency: Are Constitutional Deprivations Necessary?*, 10 Amer. Crim.L.Rev. 465 (1972).