Revised August 24, 2001

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 00-10784**

_____

**THOMAS JOE MILLER-EL,**

**Petitioner-Appellant,**

**VERSUS**

**GARY L. JOHNSON, DIRECTOR,**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**INSTITUTIONAL DIVISION,**

**Respondent-Appellee.**

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

August 7, 2001

Before JONES, DeMOSS and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Petitioner Thomas Joe Miller-El ("Miller-El"), who was convicted of capital murder in Texas state court and who was sentenced to death therefor, and whose petition for habeas corpus relief and request for a Certificate of Appealability ("COA") therefrom were both denied by the federal district court below, now seeks from this Court a COA pursuant to 28 U.S.C. § 2253(c)(2).

For all of the reasons set forth below, we DENY the request for a COA.

## I.  BACKGROUND

In 1985, Miller-El's wife, Dorothy Miller-El, was employed as a night maid for the lobby area of the Holiday Inn South.  She arranged for a religious convention for the Moorish Science Temple's Feast on November 8-10, 1985.  Her husband was among the attendees.  After the convention, Dorothy did not return to work.  Shortly before midnight on November 15, 1985, Dorothy returned to the Holiday Inn claiming that she was there to pick up her paycheck.  She was given access to the office area near the vault.

During this time period, four hotel employees were working, Doug Walker, Donald Hall, Anthony Motari, and Mohamed Ali Karimijoji.  Hall, the chief auditor, was training Mohamed regarding the hotel's daily closing procedures.  Hall instructed Mohamed to close out the cash registers, a process which would take one-half hour.  Mohamed encountered a woman who claimed that she needed accompanying while she waited for her ride.  Mohamed sent her to the front desk area without leaving the locked area he was in.

At the front desk, a man later identified as Miller-El appeared and requested a room from Hall.  Witnesses identified Miller-El from having seen him at the Moorish Feast convention the previous week.  A younger man, later identified as Kenneth Flowers

2

and dressed in army fatigues and a headset, peered around the corner as Hall was giving Miller-El his room key, and once spotted by Hall, he also approached the counter. Miller-El told Hall that he would be needing two beds. Seconds later, Miller-El and Flowers pulled out weapons. Miller-El brandished a semi-automatic "tech" nine millimeter machine gun, with a flash suppressor for night use. Flowers had a .45 caliber hand gun.

Hall complied with Miller-El's instructions to empty the cash drawer and place the money on the counter. Miller-El then ordered Hall to bring any other people in the back out front. Hall instructed Walker to come out. Flowers jumped over the counter and the two men instructed Hall and Walker to lay on the floor. The two men led Hall and Walker to the bellman's closet which they ordered opened. Once the two men removed all of the valuables from the closet and took Walker's and Hall's wallets, Miller-El tied Walker's hands behind his back, tied his legs together, and gagged him with strips of fabric. Flowers did the same to Hall. Walker was laid on his face and Hall was laid on his side.

Miler-El asked Flowers if he was going to "do it" and Flowers responded that he couldn't. Flowers then left. Miller-El stood at Walker's feet, removed his glasses and then shot Walker in the back two times. Hall closed his eyes after the first shot. He heard two more shots and realized that he had also been wounded. Hall tried to talk to Walker but only heard him choking. When he heard familiar voices outside, Hall screamed for help.

Several days after the robbery-murder, Officer Cagle was on surveillance of an apartment complex believed to be Dorothy Miller-El's. He spotted Dorothy and Flowers. With the assistance of back-up units, he stopped their vehicle and arrested them both. Search warrants were executed for the residence, and "walkie-talkie" headsets were found. When Miller-El was later arrested, found in his possession was an arsenal of weapons including the "tech" nine millimeter murder weapon.

## II.   PROCEDURAL HISTORY

Miller-El pleaded not guilty to and in March 1986 was tried before a jury on the charge of capital murder during the course of committing a robbery. On March 24, 1986, the jury returned with a guilty verdict and at the conclusion of the sentencing phase, the same jury answered in the affirmative to the special issues set forth in the Texas Code. Accordingly, the trial court imposed upon Miller-El the sentence of death.

Miller-El's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals. On December 14, 1992, that court affirmed Miller-El's conviction and sentence in an unpublished opinion. *See* ***Miller-El v. State***, No. 69,677 (Tex. Crim. App. 1992)(en banc)(unpublished). And on October 4, 1993, the Supreme Court denied Miller-El's petition for writ of certiorari. *See* ***Miller-El v. Texas***, 114 S. Ct. 100 (1993).

Miller-El then filed an application for state habeas relief.

4

The state trial court judge entered findings of fact and conclusions of law recommending denial of Miller-El's state habeas petition. On June 17, 1996, the Texas Court of Criminal Appeals adopted the trial judge's findings of fact and conclusions of law and denied Miller-El's application for state habeas corpus relief. *See **Ex parte Miller-El***, No. 31,001-01 (Tex. Crim. App. 1996) (unpublished).

On June 17, 1997, Miller-El filed his petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 in federal district court. On August 12, 1997, Miller-El filed an amended petition for habeas corpus. Miller-El's petition was referred to a magistrate judge who, on January 31, 2000, issued findings and conclusions, recommending a denial of relief. On June 5, 2000, after receiving objections and conducting a hearing on the magistrate judge's report and recommendation, the district court adopted the magistrate's findings and conclusions and denied Miller-El's petition for a writ of habeas corpus. The district court subsequently denied Miller-El's motion to alter or amend the final judgment denying relief on June 21, 2000. Miller-El then filed a notice of appeal in this Court and a motion for a COA in the district court. On August 14, 2000, the district court denied Miller-El's request for a COA on each of the issues raised herein. It is Miller-el's renewed request for a COA that is presently before us.

### III. DISCUSSION

Miller-El seeks from this Court a COA on each of the following issues: (1) whether the district court erred in overruling his challenges of improper peremptory juror strikes; (2) whether the state court erred in failing to conduct a *sua sponte* evidentiary hearing regarding his competency to stand trial and in finding that he was competent to stand trial in 1986; (3) whether the district court likewise erred in failing to conduct a hearing regarding his competency; and (4) whether the district court erred finding that his First and Fourteenth Amendment rights were not violated by admission of evidence, during the punishment phase of his trial, relating to his affiliation with the Moorish Science Temple..

Miller-El's petition for writ of habeas corpus was filed on June 17, 1997, and is thus governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See **Lindh v. Murphy***, 117 S. Ct. 2059, 2068 (1997); ***United States v. Carter***, 117 F.3d 262 (5th Cir. 1997). Under AEDPA, before an appeal from the dismissal or denial of a § 2254 habeas petition can proceed, the petitioner must first obtain a COA, which will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The same standards that governed issuance of the pre-AEDPA version of the COA, the certificate of probable cause ("CPC"), apply to requests for a COA. *See **Slack v. McDaniel***, 120 S. Ct. 1595, 1603 (2000). A petitioner

6

makes a "substantial showing" when he demonstrates that his petition involves issues which are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are adequate to deserve encouragement to proceed further. *See id.* at 1603-04.

Additionally, pursuant to § 2254(e)(1), a state court's determination of a factual issue must be presumed correct, and the habeas petitioner bears the burden of rebutting the presumption by clear and convincing evidence. The presumption of correctness is especially strong, where, as here, the trial court and the state habeas court are one and the same. *See **Clark v. Johnson***, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 121 S. Ct. 84 (2000).

And while the nature of the penalty in a capital case is an appropriate consideration for determining whether to issue a COA, the severity of the penalty at issue does not, in and of itself, *require* the issuance of a COA. *See **Clark***, 202 F.3d at 764 (citing **Lamb**, 179 F.3d at 356). However, in capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner. *See **Lamb***, 179 F.3d at 356. Cognizant of the foregoing principles, we turn now to consider those issues raised by Miller-El in his request for a COA.

## A.

Miller-El first contends that he is entitled to a COA regarding his challenge to the prosecution's alleged improper use

of peremptory strikes to exclude African-Americans from his jury. Miller-El argues that the Supreme Court's decision in *Swain v. Alabama*, 85 S. Ct. 824 (1965), is still the applicable law regarding challenges to improper peremptory strikes when evidenced by data indicating historic, systematic discrimination against African-Americans. However, during the pendency of Miller-El's direct appeal, the Supreme Court decided *Batson v. Kentucky*, 106 S. Ct. 1712 (1986), in which it stated that "[t]o the extent that anything in *Swain v. Alabama* is contrary to the principles we articulate today, that decision is overruled." *Batson*, 106 S. Ct. at 1725. Yet Miller-El contends that *Batson* only overruled one part of *Swain*. According to Miller-El, while under *Batson*, a defendant is no longer required to establish a prima facie case of racial discrimination based upon proof of historical, consistent, and systematic exclusion of African-Americans from juries, if racial discrimination is proffered, nevertheless, under *Swain*, then *either* the *Swain* or *Batson* evidentiary formulations apply. Miller-El argues that the evidentiary formulation of *Swain* is, thus, applicable to his claim of systematic exclusion. The government contends that the *Batson* evidentiary formulation overruled the *Swain* formulation on which Miller-El relies.

Under *Swain*, a defendant was required to show the prosecutor's "systematic use of peremptory challenges against Negroes over a

8

period of time" as a predicate. *See **Swain***, 85 S. Ct. at 839. Assuming that a defendant would be able to demonstrate a historical pattern of discrimination continuing unabated to the defendant's trial, the burden would then shift to the prosecutor to rebut the defendant's allegations. *See **Alexander v. Louisiana***, 92 S. Ct. 1221, 1226 (1972). To satisfy his burden, the prosecutor could do one of two things. First, the prosecutor could show that the systematic disparity resulted from racially-neutral selection procedures. Second, the prosecutor could "show neutral reasons for the striking of all the blacks in petitioner's trial itself." ***Willis v. Zant***, 720 F.2d 1212, 1220-21 (11th Cir. 1983). However, in any case under ***Swain***, we have held that it is not sufficient to prove a ***Swain*** violation based solely on statistical evidence from prior trials without some concomitant showing that the intentional and systematic discrimination continued "unabated" through to the petitioner's trial. *See **Evans v. Cabana***, 821 F.2d 1065, 1068 (5th Cir. 1987). Additionally, the prosecutor could rebut the petitioner's showing with a showing of neutral reasons. Miller-El argues that his showing under ***Swain*** requires only a showing of historical and systematic discrimination in order to establish a prima facie case.

In ***Batson***, the Supreme Court, recognizing the "crippling burden of proof" which ***Swain*** created, replaced the ***Swain*** evidentiary formulation with the new ***Batson*** standard. That new

9

standard involves the following three steps:

First: A defendant can establish his prima facie case of purposeful discriminatory petit jury selection solely upon evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. Alternatively, the defendant can make a prima facie case by proving historic, systematic discrimination;

Second: If a defendant makes a prima facie showing, the burden then shifts to the government to provide a race-neutral explanation for challenging the excluded jurors;

Third: The trial court must then determine if the defendant has established purposeful discrimination, and the trial court's determination is a finding fact entitled to the applicable level of deference on appellate review.

*See* ***Batson***, 106 S. Ct. at 1723-24.

Despite Miller-El's contention that the ***Swain*** evidentiary framework was untouched by ***Batson***, the Supreme Court has itself explicitly stated "we reject [***Swain's***] evidentiary formulation as inconsistent with standards that have been developed since ***Swain*** for assessing a prima facie case under the Equal Protection Clause." ***Id.*** at 1721; *see also* ***Georgia v. McCullum***, 112 S. Ct. 2348 (1992) (stating that "[i]n ***Batson v. Kentucky***, [] the Court discarded ***Swain's*** evidentiary formulation").

With respect to the second step in the ***Batson*** analysis, the Court stated specifically:

10

> Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's [race-neutral] explanation need not rise to the level justifying exercise of a challenge for cause.

*Batson*, 106 S. Ct. at 1723. Miller-El suggests that contrary to the above language in step two of the *Batson* evidentiary framework, the level of explanation required to rebut the prima facie case is governed by the rebuttal stage of the evidentiary formulation of *Swain* and is a "heavy burden." However, as we have noted, the Supreme Court has explicitly overruled the evidentiary formulation of *Swain* to the extent that it would contradict any principle, evidentiary or otherwise, announced in *Batson*. *See id*. at 1725. Thus, to the extent that the two burdens of rebuttal in *Swain* and *Batson* are inconsistent, the Supreme Court has mandated that the standard in *Batson* be applied. Here, *Batson* was decided during the pendency of Miller-El's direct appeal, and it is, thus, the applicable standard for analyzing his challenge to the use of peremptory juror strikes. *See Griffith v. Kentucky*, 107 S. Ct. 708 (1987) (holding that *Batson* governs claims by defendants whose appeals were pending and non-final at the time *Batson* was decided).

Miller-El contends that the state court's adjudication was an unreasonable application of *Batson* and that the court's findings were also unreasonable in light of his prima facie showing. His

11

primary challenge is to the district court's alleged failure to give proper weight and credit to the evidence which he presented regarding the historical data evidencing exclusion of African-American jurors.

The state court findings in this case on the issue of discriminatory intent, despite Miller-El's protestations to the contrary, are entitled to great deference. *See **Hernandez v. New York***, 111 S. Ct. 1859, 1868 (1991). As an appellate court reviewing a federal habeas petition, we are required by § 2254(d)(2) to presume the state court findings correct unless we determine that the findings result in a decision which is unreasonable in light of the evidence presented. And the unreasonableness, if any, must be established by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The detailed factual findings made by the state trial court establish that each of the challenged African-American jurors was stricken on race-neutral grounds. Miller-El has addressed the peremptory challenge of six of the ten ***Batson*** jurors in his request for a COA. We have now conducted an independent review of the findings of the state court and of the evidence presented by Miller-El in his application. Suffice it to say, and without commenting on each of the challenged jurors and the reasons proffered for their being excluded, we find that the state court's findings are not unreasonable and that Miller-El has failed to

12

present clear and convincing evidence to the contrary.  The findings of the state court that there was no disparate questioning of the **Batson** jurors and that the prosecution's reasons for striking the jurors was due to their reluctance to assess and/or their reservations concerning the death penalty are fully supported by the record.

Having determined that the state court's adjudication neither resulted in a decision that was unreasonable in light of the evidence presented nor resulted in a decision contrary to clearly established federal law as determined by the Supreme Court, we conclude that this issue would not be debatable among jurists of reason, that courts could not resolve the issues in a different manner, and that the issue does not deserve encouragement to proceed further.  Miller-El has thus failed to make a substantial showing of the denial of a constitutional right.  Accordingly, we deny Miller-El's request for a COA on this issue.

## B.

Miller-El's second issue consists of two parts that revolve around his claim that he was incompetent to stand trial.  He first claims that the state trial court erred in failing to provide him with a *sua sponte* evidentiary hearing pursuant to **Pate v. Robinson**, 86 S. Ct. 836 (1966).  Second, he challenges his conviction as infirm under **Dusky v. United States**, 80 S. Ct. 788 (1960), on the basis that he was incompetent, in fact, at the time of his trial.

13

Before analyzing these claims, a brief review of some additional facts is necessary.

Miller-El was tried some eight weeks following his arrest. Incident to his arrest, Miller-El was wounded by a gunshot. During the months following his arrest, Miller-El underwent surgical treatment for his injuries, and he experienced complications such as weight loss. On three separate occasions during his trial, Miller-El was evaluated by a doctor at the direction of the trial court. First, during jury selection, he experienced chest pains, chills, and a fever. He was diagnosed with pneumonia and was treated and discharged the same day. Nine days later, still during jury selection, Miller-El complained of delays in receiving medication. The trial court ordered a second evaluation to determine if Miller-El needed more medication. The doctor determined that he did not. Two days before jury selection concluded, Miller-El was taken to the hospital for treatment of a chest abscess. During his trial, Miller-El complained of pain in his ribs and asked to see a doctor. And finally, on the evening of the day he was found guilty, the trial judge ordered a medical evaluation to determine if Miller-El would be able to sit through court after complaining of nausea and colostomy bag complications. He was kept overnight in the hospital and was released the next day when the punishment phase of his trial began.

Miller-El complains that he was denied a competency hearing at trial and that his due process rights were denied because whenever

evidence raises a sufficient doubt about the mental capacity of the accused to stand trial, a hearing is required. *See* ***Drope v. Missouri***, 95 S. Ct. 896, 908 (1975); ***Pate***, 86 S. Ct. 836. Miller-El contends that the evidence raised a sufficient doubt as to his competency.

In ***Carter v. Johnson***, 110 F.3d 1098 (5th Cir. 1997), we explained the procedural inquiries and burdens required for the two competency claims Miller-El asserts. Specifically, we summarized as follows:

> The issue of competency may arise in two distinct contexts. *See* ***United States v. Williams***, 819 F.2d 605, 607-09 (5th Cir. 1987); ***Lokos v. Capps***, 625 F.2d 1258, 1261-62 (5th Cir. 1980). We must distinguish between them for purposes of the present case.
>
> First, a habeas petitioner may allege that state procedures were inadequate to ensure that he was competent to stand trial. A trial court must conduct an inquiry into the defendant's mental capacity sua sponte if the evidence raises a bona fide doubt as to competency. ***Pate v. Robinson***, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815 (1966). If the trial court receives evidence, viewed objectively, that should raise a reasonable doubt as to competency, yet fails to make further inquiry, this constitutes a denial of a fair trial.

*See* ***Lokos***, 625 F.2d at 1261. If a ***Pate*** violation is established, the federal habeas court must consider whether a meaningful hearing can be held nunc pro tunc to determine retrospectively the petitioner's competency as of the time of trial. ***Id.*** at 1262. If so, the petitioner bears the burden of proving his incompetence by a preponderance of the evidence; if not, the habeas writ must issue, subject to retrial at the state's discretion. ***Id.*** This ***Pate*** procedural guarantee is not before us, having been expressly abandoned by Carter on appeal.

> Second, a habeas petitioner may collaterally attack his state conviction by directly alleging incompetence at the time of trial, thereby claiming

15

a violation of the substantive right not to be tried and convicted while incompetent, rather than of the procedural guarantee of a competency hearing in the event that a bona fide doubt arises at trial as to competency:

It is always open for the defendant to later assert his actual incompetence at trial in a subsequent collateral proceeding, but the substantive claim should not be confused with a defendant's procedural rights under Pate to a hearing whenever a bona fide doubt as to competence surfaces at trial.

*Carter v. Johnson*, 131 F.3d 452, 458 n.10 (5th Cir. 1997).

First, with respect to whether Miller-El was entitled to a hearing, the relevant inquiry is whether the district court received information "which, if objectively considered, should reasonably have raised a doubt about the defendant's competency and alerted [it] to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Lokos*, 625 F.2d at 1261. In this case, the trial court specifically found that Miller-El was competent to stand trial, both at the trial and again on state habeas review. Specifically the court found:

(1) petitioner was legally competent both on and off his pain medication; (2) he had the capacity to understand the nature and object of the proceedings against him, consult with his attorneys, and assist in the preparation of his defense; and (3) a competency hearing was not required because "there was no 'bona fide doubt' as to [petitioner's] competence to stand trial.

Our independent review of the record evidence convinces us that the district court's finding that Miller-El was not entitled

16

to a hearing is not unreasonable, and Miller-El has failed to present clear and convincing evidence to the contrary.

With respect to whether Miller-El was, in fact, incompetent, we find that the district court's conclusion that he was not, is reasonable, and likewise, we find that the state court's decision does not represent an unreasonable application of federal law. Thus, we conclude that Miller-El has failed to make a substantial showing of the denial of a constitutional right, and we deny Miller-El's request for a COA on this issue.

## C.

In his third issue, Miller-El claims that he is entitled to a COA because the federal district court erred in refusing to conduct an evidentiary hearing *nunc pro tunc* to determine whether he was competent to stand trial in 1986. Having concluded above that Miller-El has failed to establish a bona fide doubt as to his competency at trial under **Pate** and that the state court's determination of competence was reasonable, we need not readdress this issue.

A state court's competency determination is a finding of fact entitled to a presumption of correctness under § 2254(d)(2). And we have stated that "[b]efore the federal district court has a duty to investigate a habeas petitioner's claim of incompetency, the petitioner must show that there are sufficient facts to 'positively, unequivocally and clearly generate a real, substantial

17

and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during trial.'" *Moody v. Johnson*, 139 F.3d 477, 481 (5th Cir. 1998) (quoting *Washington v. Johnson*, 90 F.3d 945, 950 (5th Cir. 1996)). Under Section 2254(e)(1), a habeas petitioner is entitled to a *nunc pro tunc* evidentiary hearing for the purpose of proving that he was incompetent at the time he stood trial only when he "makes a showing by clear and convincing evidence to raise a threshold doubt about his competency." *Lokos*, 625 F.2d at 1261. This threshold burden is "extremely heavy," *Johnson v. Estelle*, 704 F.2d 232, 238 (5th Cir. 1983), and requires that a petitioner present facts sufficient to "positively, unequivocally, and clearly generate a real, substantial and legitimate doubt" concerning his mental competence, *id*. at 238. *See also* *Jackson v. Anderson*, 112 F.3d 823 (5th Cir. 1997) (noting that § 2254(e)(1) places a heavier burden on petitioners seeking to rebut state court fact findings).

Miller-El suggests that he was entitled to an evidentiary hearing in the federal district court because he was not given a live hearing in the state court. The state habeas court instead based its decisions upon the parties' supplemental briefing and expert affidavits, i.e, Miller-El received only a paper hearing. We find Miller-El's suggestion untenable, especially where, as here, the trial judge and the state habeas judge were the same. *See* *Clark v. Johnson*, 202 F.3d at 766 ("we have repeatedly found

18

that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying the petitioner's claims, especially where . . . the trial court and the state habeas court were one in the same.").

We conclude that Miller-El has failed to make a substantial showing of the denial of a constitutional right on this issue in that he has failed to rebut the presumptive correctness of the state habeas and district court findings that he was competent to stand trial in 1986 and that he was not entitled to a *nunc pro tunc* hearing to determine competency. Accordingly, we deny Miller-El's request for a COA on this issue.

## D.

In his fourth and final issue, Miller-El argues that he is entitled to a COA on his claim that his First and Fourteenth Amendment rights were violated by the admission of evidence, during the punishment phase of his trial, relating to his affiliation with the Moorish Science Temple faith in violation of **Dawson v. Delaware**, 112 S. Ct. 1093 (1992). In **Dawson**, while the Supreme Court held that where religious affiliation unrelated to any issue in the case may be impermissible, there is no "per se" barrier to the admission of evidence which concerns a defendant's beliefs and associations at sentencing. **Dawson**, 112 S. Ct. at 1097. The Court noted that "[i]n many cases . . . associational evidence might serve a legitimate purpose in showing that a defendant represents

19

a future danger to society." *Id.* at 166. We have, likewise, held that if the evidence regarding a defendant's affiliations or personal beliefs is sufficiently related to the issues involved, there is no constitutional violation. *See Boyle v. Johnson*, 93 F.3d 180, 183-84 (5th Cir. 1996).

Here the state habeas court concluded that Miller-El's association with the Moorish Science Temple was inextricably intertwined with his conviction and sentence. Evidence was entered in the guilt phase regarding his membership as part of testimony regarding witnesses' ability to identify him through his participation in the Moorish Temple Feast at the murder scene the week before the robbery-murder. Thus, introduction of this evidence during the guilt phase was relevant to other matters.

The additional references to his membership during the punishment phase of his trial, as the state court found, were appropriate as they related to his involvement with other group members who were heavily armed and who assisted in the commission of Miller-El's offense of conviction. The government's characterization of Miller-El as belonging to a heavily armed paramilitary group was supported by the evidence and was probative as an indicator of future dangerousness.

Having conducted an independent review, we conclude simply that the state court's determination that Miller-El's due process rights were not violated by the prosecution's reference to his

20

membership in the Moorish Science Temple faith was consistent with and was not contrary to the Supreme Court's applicable holding in *Dawson*. Furthermore, we conclude that the state court's adjudication of this claim was reasonable, and therefore, we deny Miller-El's request for a COA on this issue.

## IV.  CONCLUSION

Having carefully reviewed the record, we conclude that Miller-El has failed to make a substantial showing of the denial of a constitutional right with respect to any of the issues raised in his request for COA, and accordingly, we DENY his request for COA on all issues raised therein.