# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 08-1040 consolidated with 08-1042

STATE OF LOUISIANA

VERSUS

C. C.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 124,685-A and 142,039-A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**JAMES T. GENOVESE
JUDGE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Court composed of Marc T. Amy, Billy H. Ezell, and James T. Genovese, Judges.

**CONVICTION AND SENTENCE REVERSED;
CASE REMANDED FOR NEW TRIAL.**

**Sherry Watters**
**Louisiana Appellate Project**
**Post Office Box 58769**
**New Orleans, Louisiana 70158-8769**
**(504) 723-0284**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    C. C.

**Charles A. Riddle, III**
**District Attorney – Twelfth Judicial District**
**Dan B. McKay, Jr.**
**Assistant District Attorney**
**Post Office Box 1200**
**Marksville, Louisiana 71351**
**(318) 253-6587**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

## PROCEDURAL HISTORY

On September 7, 2004, the Defendant, C.C.,[1] was charged by bill of information with indecent behavior with a juvenile, a violation of La.R.S. 14:81. The Defendant filed an Application for Appointment of Sanity Commission on November 8, 2004, and a sanity commission was ordered on April 21, 2005. Following a sanity hearing held on June 14, 2007, the Defendant was found mentally competent to stand trial.

On the day of trial, September 5, 2007, the Defendant filed a Motion for Continuance with Request for Appointment of Psychiatric/Psychological Expert and Request for Expedited Consideration. In his motion, the Defendant entered a plea of not guilty by reason of insanity. The motion was considered prior to jury selection and was denied. At the conclusion of the jury trial, the Defendant was found guilty as charged. On October 16, 2007, the Defendant filed a Motion for Post Verdict Judgment of Acquittal or in the Alternative a Motion for New Trial. The motion was denied following a hearing on November 20, 2007.

Also, on November 20, 2007, the State filed a Habitual Offender Bill of Information, charging the Defendant as a second felony offender. The Defendant was adjudicated a second felony offender following a hearing on January 15, 2008. He was sentenced on February 19, 2008, to serve ten years at hard labor "without benefit of probation or suspension of sentence." A Motion to Reconsider Sentence was filed on March 3, 2008, asserting that the Defendant's sentence was excessive in light of the circumstances of the crime. The motion was denied following a hearing on May 20, 2008.

_____

[1]Initials are being used in accordance with La.R.S. 46:1844(W).

The Defendant appeals, setting forth four assignments of error. For the following reasons, the Defendant's conviction and sentence are reversed and set aside, and the case is remanded to the trial court for a new trial.

## FACTS

On July 13, 2004, A.R., the mother of the juvenile victims, was walking home from work when she encountered the Defendant, A.R.'s cousin. He began a conversation with her while they were walking. When A.R. picked up her pace, the Defendant also walked faster. When they arrived at her home, the Defendant asked for a glass of water, and she obliged, but she made him wait on the porch. A.R. then brought the water to the Defendant, closed the door, and went back into the house to join her two children, the victims herein, then ages ten and four.

Next, the Defendant opened the door, entered the house with the glass of water, and poured out the water in the kitchen sink. A.R. asked the Defendant to leave but he refused, and they both went for the door. The Defendant prevented A.R. from opening the door with one hand, and, with his other hand, he removed his penis from his pants and began masturbating in front of A.R. and her children. A.R. continued to struggle with the Defendant over the door, and the Defendant eventually let go of the door and ran away.

## ASSIGNMENTS OF ERROR

1. The district court erred in denying the indigent defendant funds to hire an expert in psychology or psychiatry to assist in the proof of his inability to assist counsel and his sanity at the time of the offense.

2. The district court erred in finding C.C. competent to assist counsel and competent to stand trial where there was evidence of C.C.'s long history of mental problems, one evaluator found he was unable to testify, and where the defendant's behavior throughout the proceedings demonstrated his lack of understanding of the proceedings.

2

3.  The district court erred in finding the defendant to be a second felony offender when there was no evidence that the first offense was a felony and not a misdemeanor criminal damage to property.

4.  The ten[-]year sentence imposed by the Twelfth Judicial District Court is disproportionate and excessive under L.S.A. - Const. Art. 1, Sec. 20, and it is cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent as to post conviction relief and that the commitment of sentencing is in need of correction; however, these matters need not be addressed due to our reversal and remand as hereinafter set forth.

### ASSIGNMENT OF ERROR NO. 2:

Because the outcome of this assigned error renders the remaining assignments of error moot, we shall address it first. In this assignment of error, the Defendant argues that the trial court erred in finding him competent to stand trial.

The record indicates that, following a request by defense counsel, a sanity commission was ordered by the trial court, and the Defendant was examined accordingly. On May 25, 2007, the State motioned the trial court in writing to hold a sanity hearing to determine the Defendant's capacity to proceed. In response to that motion, the trial court held a hearing on June 14, 2007, wherein the trial court ruled that the Defendant was competent to stand trial and able to assist with his defense. Although the Defendant did not object to the trial court's ruling, a strict reading of La.Code Crim.P. art. 841(B) indicates that an objection was not required because the trial court ruled on a written motion. *State v. Page*, 02-689 (La.App. 5 Cir. 1/28/03),

3

837 So.2d 165, *writ denied*, 03-951 (La. 11/7/03), 857 So.2d 517.

Louisiana Code of Criminal Procedure Article 642 sets forth the procedure for raising the issue of a defendant's mental incapacity, providing as follows:

> The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.

When the trial court "has reasonable ground to doubt the defendant's mental capacity to proceed[,]" it is required to "order a mental examination of the defendant" pursuant to La.Code Crim.P. art. 643.

Additionally, as explained by the supreme court in *State v. Anderson*, 6-2987, p. 21 (La. 9/9/08), 996 So.2d. 973, 992:

> [r]easonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. *State v. Snyder*, 98-1078, p. 24 (La. 4/14/99), 750 So.2d 832, 851 (quoting *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir.1980).

In the instant case, a sanity commission was ordered, and the Defendant was evaluated by L.J. Mayeux, M.D., and Daniel J. Lonowski, Ph.D. Dr. Mayeux examined the Defendant on April 25, 2005. During the exam, the Defendant stated that he was doing well on his current medication regime, that he no longer heard voices, and that he was sleeping well in prison. Dr. Mayeux observed that the Defendant was "oriented to time, place, person, and situation."

With regard to the offense, the Defendant stated that he was incarcerated for simple battery. The Defendant maintained that sometime in June or July of 2005,

4

prior to the exam, he entered the home of A.R. and hit her. He correctly identified his defense attorney, Bridget Brown, and the name of the detective investigating the offense, Chad Jeansonne. The Defendant understood that a court date was pending and that, if he was found guilty, he may serve jail time. He expressed that he did not want to go to jail and that he felt that he was innocent. The Defendant also stated that he could assist Ms. Brown in his defense. Dr. Mayeux reported that the Defendant was able to answer all of his questions without difficulty. Accordingly, Dr. Mayeux opined that the Defendant could assist in his defense and should be allowed to go to trial.

The Defendant was then examined by Dr. Lonowski on May 24, 2005, who subsequently compiled an extensive and detailed report. Notably, Dr. Lonowski's report painted a significantly different picture of the Defendant than that of Dr. Mayeux. First, the Defendant's mental status examination revealed that the Defendant "had difficulty expressing his ideas clearly and [that he] often gave vague or esoteric explanations." Dr. Lonowski observed that the Defendant appeared to be distracted and "preoccupied with his own thoughts." The Defendant was described, however, "as polite, cooperative, and cordial," with a somewhat blunted affect and a mildly depressed mood. The Defendant described visual hallucinations and indicated that he experienced auditory hallucinations late at night. He reported that he was not afforded any mental health treatment while incarcerated and that he was not currently taking medication. He expressed difficulty sleeping at night and that he napped during the day.

The Defendant's cognitive examination revealed that "[h]e was not completely oriented" to the day of the week or the day of the month. He was oriented to month

5

and year and to the city and state where he was living. With regard to memory, Dr. Lonowski reported that "he exhibited mild interference with immediate or working memory, while his recent memory was more focused," and his remote memory was "spotty." "He demonstrated mild problems sustaining attention, but his concentration was adequate." The Defendant's "knowledge and verbal abstraction skills were estimated to be in the borderline range."

The Georgia Court Competency Test was administered to assess the Defendant's understanding of the judicial process. A score above seventy on a scale of zero to one hundred is considered to be a passing score. As such, Dr. Lonowski stated that the Defendant's score of ninety-four indicated that he had an "adequate understanding of judicial proceedings." With regard to the offense, the Defendant admitted that he took out his penis in front of his cousin, A.R., but asserted that he had smoked marijuana that day and was under a lot of stress. "He admitted he knew what he was doing was wrong at the time, but he felt [that] it was unfair he was arrested." According to the Defendant, he believed that he was "tricked by a detective who told him [that] he would not be charged if he told [the detective] what happened."

During the Wechsler Adult Intelligence Scale – III, Dr. Lonowski noted that the Defendant "responded adequately during structured testing, but he made peculiar social references during casual conversation," that "he was unable to follow casual conversation," and that his attention and concentration was fair to poor. The Defendant's test results reflected a Verbal IQ of 67, a Performance IQ of 60, and a Full Scale IQ of 62, all within the range of mild mental retardation. The Woodcock Johnson 3 – Test of Achievement assessed the Defendant's reading ability and

6

indicated that he was below the first percentile compared to the national standards with a grade equivalency ranging from first to second grade.

Based on the above observation and test results, Dr. Lonowski's diagnoses included psychotic disorder, cannabis dependence, and mild mental retardation. Despite his intelligence level, the Defendant demonstrated his capability to understand various aspects associated with a trial. Dr. Lonowski opined that the Defendant had "sufficient understanding of the nature of the charges he [was] facing" and could "appreciate the degree of seriousness associated with those charges." The Defendant was "capable of understanding the defenses available to him, and he was able to distinguish between a guilty and not guilty plea." The Defendant also had sufficient understanding of his legal rights "and the consequences of either plea."

Dr. Lonowski also concluded that, with careful interviewing, the Defendant "probably could recall and relate pertinent facts about his actions and whereabouts surrounding the time he was arrested." As such, the Defendant "could assist his counsel in locating and examining relevant witnesses." Dr. Lonowski noted, however, that the Defendant was not likely to "maintain a consistent defense because of his psychiatric condition," and he may not always be able to listen to the testimony of witnesses. As such, Dr. Lonowski recommended that "he be referred for psychiatric assistance with the use of appropriate medications" to which he had responded in the past. Despite his impairments, however, Dr. Lonowski concluded that the Defendant had "the ability to make simple decisions in response to well-explained alternatives."

With regard to testifying in his own defense, Dr. Lonowski stated that the Defendant was not capable of doing so at the time. With appropriate medication,

7

however, "his capability would likely improve." Dr. Lonowski believed that the stress of a trial would likely intensify the Defendant's psychological problems and that he would decompensate. Lastly, Dr. Lonowski concluded that the Defendant "may have been diminished in capacity at the time of the commission of the alleged offenses," but believed that the Defendant met "the standards for sanity as defined by Louisiana law." He asserted that the Defendant's "ability to stand trial would be enhanced if he were afforded psychiatric treatment."

Upon the State's motion, a sanity commission hearing was held on June 14, 2007, more than two years after Dr. Lonowski's evaluation. Immediately before the hearing began, the appointment of Bridget Brown as counsel for the Defendant was vacated by the trial court, and Derrick Whittington was appointed as defense counsel. Next, the trial court acknowledged the findings in the reports submitted into evidence and noted the conclusions of the evaluators. The trial court also observed Dr. Lonowski's suspicion that the Defendant may have had a diminished capacity at the time of the offense, but that the Defendant did not meet the standards for insanity. Accordingly, the trial court ruled that the Defendant was competent to stand trial and assist with his defense.

On appeal, the Defendant refers to Dr. Lonowski's report of his I.Q. score, his first or second grade reading level, his hallucinations, and his diagnoses of mild mental retardation, psychosis, and diminished capacity. The Defendant also focuses on Dr. Lonowski's opinion that he could not testify and that treatment and medication were recommended to improve his competency to proceed. The Defendant also maintains that his conduct and comments at trial and sentencing are evidence of his lack of understanding of these proceedings and support Dr. Lonowski's findings.

8

***Psychiatric Treatment and Medication***

Several times in his report, Dr. Lonowski recommended psychiatric assistance and medication. First, Dr. Lonowski opined that the Defendant would not likely maintain a consistent defense because of his psychiatric condition and recommended that he be referred for psychiatric assistance with the use of appropriate medications. Next, Dr. Lonowski stated that the Defendant may not always be able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements because of mental retardation and psychotic symptoms. Again, Dr. Lonowski recommended the use of appropriate medications to improve the Defendant's ability to listen. Dr. Lonowski also concluded that the Defendant was not capable of testifying in his own defense, but again noted that medication would likely improve his ability to testify. Lastly, Dr. Lonowski concluded that the Defendant's ability to stand trial would be enhanced if he were afforded treatment. Despite Dr. Lonowski's repeated recommendation that the Defendant needed psychiatric treatment to promote and/or enhance his ability to proceed to trial, the trial court did not investigate whether or not the Defendant received psychiatric treatment during the approximate two-year time period he was awaiting trial or whether he was receiving psychiatric treatment at the time of the hearing.

In a similar case, *Snyder*, 750 So.2d 832, a sanity commission was appointed prior to trial, and the defendant was examined for his competency by a forensic psychiatrist and a clinical psychologist. At the sanity hearing held seven days following the exams, the psychiatrist testified that the defendant was able to assist in his own defense as well as understand the proceedings against him. The psychiatrist also testified, however, that the defendant had some difficulty focusing on certain

issues and became mildly circumstantial, giving excessive and over-detailed information without giving the needed information, and was tangential, i.e., getting off the subject. Because of these difficulties, the psychiatrist recommended that the defendant's medication prescribed for the treatment of depression should be changed. She explained that the defendant could only tolerate very low dosages of the original medication due to its side effects and that the low dosages did not totally alleviate his symptoms. The psychiatrist opined that a change in medication could alleviate both symptoms and improve communication with the defendant. According to the psychiatrist, the defendant could have seen improvement in attention and concentration within one to two weeks, while full benefits of the medication change would be seen about six weeks later. At the conclusion of the hearing, the defendant was found to be competent to stand trial.

Eight days after the hearing, but only nineteen days prior to trial, the defendant's medication was subsequently changed as recommended. Defense counsel moved for a five-week continuance so that the defendant could receive the full benefit of the new medication. Defense counsel stressed that the continuance would allow for the improvement in the defendant's mental state to the point where he could fully assist counsel at trial. In support of his motion, the defendant introduced and filed into the record a letter from his attending psychiatrist to the trial court indicating the date the medication was changed and that it would take approximately six weeks for the defendant to attain the maximum therapeutic benefits of the new drug. The trial court, nonetheless, denied the defendant's request for a continuance, reasoning that the testimony and report of the forensic psychiatrist indicated that his symptoms did not interfere with his ability to understand the proceedings against him or to assist in

10

his defense.

Five days prior to trial, the defendant was evaluated by a clinical psychologist who noted that the defendant had been on the new medication for about one week prior to the examination, and, at the time of the examination, he had not had sufficient time to stabilize on this medication. The psychologist also reported that, once the defendant's condition stabilized on the medication, one could reasonably assume that his cognitive processes would become sharper and more focused.

On the day of trial, the trial court denied defense counsel's motion for *in camera* testimony which would detail the difficulties she experienced in communicating with the defendant and which rendered him unable to assist in his defense. Defense counsel was allowed, however, to testify in open court wherein she stated that her representation of the defendant had been compromised by his state of mind due to the fact that he had been severely depressed and inadequately treated.

On appeal, our supreme court summarized the applicable jurisprudence as follows:

> Limits on the court's discretion to grant or deny a continuance, however, are imposed by defendant's constitutional rights, including his rights to understand the proceedings against him, to assist in his defense, and to the assistance of counsel. *See United States v. Soldevila-Lopez*, 17 F.3d 480, 487 (1st Cir.1994). If a defendant lacks the ability to communicate effectively with counsel, he may be unable to exercise other rights deemed essential to a fair trial. *Cooper v. Oklahoma*, 517 U.S. 348, 364, 116 S.Ct. 1373, 1381, 134 L.Ed.2d 498 (1996). Constitutional due process requires that the trial of an accused be conducted only when he is legally competent. *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *State v. Nomey*, 613 So.2d 157 (La.1993). The test for determining defendant's mental competency depends upon "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). Defendant's allegations that he was unable to communicate with his

11

attorney thus raise serious constitutional issues. Because the record reflects that the trial court failed to make further inquiry into defendant's claims that he needed to be stabilized on his new medication in order to effectively communicate with his counsel and assist in his defense when such claims, combined with objective medical evidence, raised a sufficient doubt as to defendant's competence, we must question whether defendant received a fair trial in this regard.

In *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Court reversed petitioner's conviction because the record before it revealed that the lower courts failed to give proper weight to information suggesting petitioner's incompetence that came to light during trial. The Court found that the failure to make further inquiry into petitioner's competence to stand trial denied him a fair trial. In reaching its conclusion, the Court stated:

> The sentencing judge and the Missouri Court of Appeals concluded that the psychiatric evaluation of petitioner attached to his pretrial motion for a continuance did not contain sufficient indicia of incompetence to stand trial to require further inquiry. Both courts mentioned aspects of the report suggesting competence, such as the impressions that petitioner did not have 'any delusions, illusions, hallucinations . . . ,' was 'well oriented in all spheres,' and 'was able, without trouble, to answer questions testing judgment,' but neither court mentioned the contrary data. The report also showed that petitioner, although cooperative in the examination, 'had difficulty in participating well,' 'had a difficult time relating,' and that he 'was markedly circumstantial and irrelevant in his speech.' In addition, neither court felt that petitioner's episodic irrational acts described in the report or the psychiatrist's diagnoses of '(b)orderline mental deficiency' and '(c)hronic (a)nxiety reaction with depression' created a sufficient doubt of competence to require further inquiry.

*Id*. at 175, 95 S.Ct. at 905.

The Court noted that it did not appear the examining psychiatrist was asked to specifically consider the issue of petitioner's competence to stand trial and, like the report itself, the petitioner's "somewhat inartfully drawn motion for a continuance" did not clearly suggest that petitioner's competence to stand trial was the question sought to be resolved. However, it found the sentencing judge erred in concluding that counsel's pretrial contention that "the defendant is not a person of sound mind and should have a further psychiatric examination before the case should be forced to trial" did not raise the issue of petitioner's competence to stand trial. Finally, the Court concluded that at the stage

12

at which the pretrial motion for continuance was filed, "it would have been, at the very least, the better practice to order an immediate examination under [Missouri law]." *Id*. at 177, 95 S.Ct. at 906.

Similarly, in *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Court held that the failure to observe procedures adequate to protect a defendant's right not to be tried while incompetent deprives him of his due process right to a fair trial. There, the Court expressed doubt as to whether a defendant can waive the defense of his competence to stand trial, stating, "But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Id*. at 384, 86 S.Ct. at 841. The Court also noted that even when a defendant does not explicitly state that competence to stand trial is at issue, trial judges must consider the question of competency where the evidence presented raises a doubt as to defendant's competence. *Id*. at 384 n. 6, 86 S.Ct. at 841 n. 6.

Thus, if there is a sufficient doubt as to the mental competency of an accused, the trial court has a responsibility to order a hearing *sua sponte*. *Griffin v. Lockhart*, 935 F.2d 926 (8th Cir.1991). The *Pate* procedural guarantee is violated when, in light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial. *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir.1980)(citing *Drope*, 420 U.S. at 174, 95 S.Ct. at 905). The relevant question is: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Lokos*, 625 F.2d at 1261.

*Snyder*, 750 So.2d at 849-51.

Considering the evidence that centered on the defendant's difficulties in communicating and his alleged inability to assist counsel, the supreme court in *Snyder* concluded that the evidence should have raised a question of the defendant's competence in the trial judge's mind and that the trial court abused its discretion in its absolute failure to investigate the validity of these concerns. The court added:

Such an investigation was warranted in light of the fact that Drs. DePrato, McDermott, Richoux and Salzer all believed that defendant's condition necessitated the change in medication and that it would take approximately six weeks for the drug to reach its maximum

13

effectiveness. There is no affirmative indication on the record by the judge, the district attorney or the defense attorneys that the defendant could, in fact, or did, in fact, assist his attorney. Furthermore, defendant did not testify in either phase of his trial, so we cannot review his testimony and determine whether he had any significant difficulties in communicating. Finally, when defendant's counsel offered to specify for the record the difficulties she was experiencing in attempting to represent defendant, she was prevented from doing so by the trial judge. For all of these reasons, we cannot say with certainty whether defendant received a fair trial. Consequently, the record before us does not permit us to find that the trial court did not err in failing to make further inquiry into defendant's competency.

*Id.* at 853-54.

In the instant case, the trial court was alerted to the fact that the Defendant had an extensive history of mental illness as shown in the reports of Dr. Mayeux and Dr. Lonowski. Dr. Mayeux's report pointed out that the Defendant spent time in Crossroads Regional Hospital in 2002, a hospital that focuses on mental health services, and a short period of time in Central Louisiana State Hospital, a state hospital that also provides mental health services, several years ago. The report also reflected that the Defendant reported hearing voices.

Dr. Lonowski's report indicated that the Defendant received disability benefits for "'mental' problems." The Defendant also recounted an extensive history of psychiatric care which began when he was six or seven years old. The Defendant recalled being treated at a parish mental health center and stated that he had received almost continuous psychiatric care throughout his childhood and early adult years. He also reported that he was admitted to the adolescent center at Central Louisiana State Hospital and, in 2003, received his last psychiatric treatment at Crossroads Regional Hospital.

The Defendant's mother stated in a follow-up interview with Dr. Lonowski that the Defendant began having problems in the fourth or fifth grade involving fighting

14

and misbehavior with teachers. He was placed in special education by the sixth grade. The Defendant was admitted to Central Louisiana State Hospital at age thirteen for depression and suicidal gesturing. Following his release, the Defendant was stable as long as he took his medication, and he received monthly follow-up at a local mental health center. When the Defendant was fifteen to sixteen years old, he did not take his medication consistently and missed several appointments. Consequently, he began acting out and was hospitalized again for depression and suicidal gestures. He received follow-up care upon his release, but continued to be non-compliant with his medication and was eventually hospitalized again when he was eighteen years old.

Additionally, the trial court was aware that the Defendant was not afforded any mental health treatment during his incarceration prior to trial. Dr. Lonowski confirmed this finding with a licensed practical nurse at the Bunkie jail where the Defendant was confined. Further, the trial court was warned by Dr. Lonowski's repeated recommendations in his report that the Defendant needed psychiatric intervention and medication to enhance his ability to understand or appreciate the significance of the proceedings or rationally assist his attorney in his defense. However, the record is totally void of any inquiry by the trial court regarding the Defendant's psychiatric treatment prior to and at the time of the hearing, which, incidently, was held more than two years after Dr. Lonowski's evaluation. This fact alone was significant in assessing the Defendant's competency to stand trial and, at a minimum, should have alerted the trial court to investigate whether the recommendations of Dr. Lonowski had been implemented. The trial court made no attempt to investigate the possibility that the Defendant had not received psychiatric

treatment and medication and, thus, might be incompetent to proceed to trial.

Also, as noted above, the Defendant's sanity commission evaluations were performed more than **two years** prior to the sanity commission hearing. As such, the reports upon which the trial court relied did not, and could not, reflect the Defendant's psychiatric status at the time of the hearing. Again, this fact, considered objectively, should have raised a doubt about the Defendant's competency at the time of the hearing and alerted the trial court to the possibility that he could not understand the proceedings, could not appreciate their significance, and could not rationally aid his attorney in his defense.

Additionally, unlike the facts in *Snyder*, there is affirmative indication in the record that the Defendant's mental competency was questionable during trial and the subsequent proceedings. At trial, after the State rested its case, counsel for the Defendant informed the trial court that he had advised the Defendant not to take the stand, but that the Defendant insisted upon testifying and did testify despite his advice. The trial court then attempted to explain to the Defendant his right against self-incrimination and that, if he took the stand, he would be a witness and would be waiving this right. The Defendant then interrupted the trial court, stating, "No charges were pressed, my mother just said that," and continued to argue with the trial court that no charges had been filed against him. The Defendant's subsequent dialogue with the trial court demonstrated a total lack of understanding with regard to the allegations made, the charges filed against him, and the reason he was on trial.

The Defendant proceeded to take the stand and testified as follows:

16

BY MR. WHITTINGTON:

Q.        Mr. [C.] would you tell us in your own words your understanding of this particular case and the charges that have been filed against you?

. . . .

A.        Yea, I understand but weren't no charges pressed on. I remember the night (INAUDIBLE) when he said wouldn't no charges pressed on me, let him go. I remember the night he stuck them charges on me, Chad Jeansonne. He stuck the charges on me he was guilty I remember everything you'll was conversating up to for the whole two hours and a half how I knew what he said to me. Like we just talked about there. Did you understand about sacrifices and stuff in court. Now, you took it to this level I wish you can't understand these hypothetical levels of Judge Jeansonne.

BY THE COURT:

I can't respond to you.

BY MR. WHITTINGTON:

(INAUDIBLE) Address just the jury.

BY MR. [C.]:

Cause I can't talk to him, he, he, he don't got no understanding. All I am telling you I'm not tell under the old law. I got a whole life on the, on the line. I got, I got, I got something up, I listened to everything I'm getting misused. I'm talking about I am going through hell every since I have been here fighting in court I have been trying to tell you'll the truth but I just don't just pinpoint you all, pinpoint this lady here out, pinpoint him out, then pinpoint him out about the truth about my little niece and my nephew and my mama. So, if I ever, ever if he, if I can refresh your memories when my mamma was up, (INAUDIBLE) that do you understand to this, say yes or no. Ain't no hard answer.

ALL TALKING AT THE SAME TIME.

BY MR. [C.]:

If you understand that then why don't you plead with me in front of my family like that[?]

BY THE COURT:

Don't ask questions.

BY MR. WHITTINGTON:

You need to tell everybody what your understanding of the case is.

BY MR. [C.]:

I told you'll, what I'm trying to tell you can't hold nothing against me in the court of law. Do you understand that[?]

ALL TALKING AT THE SAME TIME.

BY MR. [C.]:

Who has a question up in here? Anybody question?

BY THE COURT:

Okay, you can't ask questions of the jurors.

BY MR. [C.]:

Anybody a question? Anybody a question? Now you understand. You understand what a question is? I'm not stupid I know what go on in every courthouse. I can show you letters. My mama got them. She just ain't going to tell you nothing. She know. I write her and I can write here a long, long, long, letter. I be books like this here. Like they say that comes from Bible.

BY THE COURT:

Okay, we are going to stop you for being non-responsive. Listen to the question and answer the question.

BY MR. [C.]:

I answered the questions. The point is what if (INAUDIBLE) she willing to let me go. She was not going to press no charges on me. I want to go home.

18

BY MR. WHITTINGTON:

Q.      Mr. [C.], do you remember anything about the alleged crimes, the alleged acts that you are being charge[d] with?

A.      All I remember is, all I remember is that she told him weren't no charges pressed on me. You remember. And he, as a matter of fact my mama said lock him up. She never told him to lock me up. My mama said.

Q.      So you don't remember anything about being in Ms. [A.R.'s] house, you don't remember anything about . . .

A.      My mama told you.

Q.      You don't remember anything about being in Ms. [A.R.'s] house, you don't remember anything about anything about the children, about getting a glass of water or anything. . .

A.      No, I don't remember nothing.

BY MR. WHITTINGTON:

Your Honor, I don't have any questions, I don't know if he has anything whether he wants to say.

BY THE COURT:

All right, go ahead and have a seat now. Just have a seat right there. Cross exam.

CROSS EXAMINATION BY NORRIS GREENHOUSE

BY MR. GREENHOUSE:

Q.      A moment ago you testified that you remember your mom and Detective Jeansonne at the police station correct?

A.      Yes, sir.

Q.      And you remember Ms. [A.R.] being at the police station to [sic] right?

A.      Ms. [A.R.] wasn't never at the police station.

Q.      But you, you can recall her according to you saying I don't want to press charges?

A.          Yes, sir.

Q.          You remember going to her house on July 14, 2004?

A.          No, sir, I went there earlier one day though that same day I went there that day but it wouldn't at that time. I went there, I remember if I come out if I get out the daily bar I am going to make my way to go her house and she knew and she going to talk to me. She talk to me now. I ain't got nothing against her.

Q.          You went to the police station with your mom on July 14th. . .

A.          Yea, I went to the police station with my mom.

Q.          And do you know why you went to the police station correct? About something involving Ms. [A.R.]? Didn't you go to the police station for that?

A.          Yea, that is what they, that is what they got caught for now.

Q.          All right, and you remember that?

A.          Yes, sir.

Q.          Right. And what you have selected processes about what you remember that day and what you don't?

A.          What is selected process?

Q.          Don't you remember going to the Bunkie Police Department and speaking with Detective Jeansonne and your mama being there with you, you don't remember being at Ms. [A.R.'s] home?

A.          I told you I went there.

Q.          You went there okay. You went there on July 14th 04. You recall taking your penis out into your hand?

A.          No, that was like 3:00 o'clock, 4:00 o'clock that evening in the daytime.

Q.          Oh, it was in the afternoon. As you can recollect that you did that?

A.          Uh.

20

Q. You recollect it being 2:00 o'clock that you pulled out your penis at her home in front of her children?

A. No, I ain't said I pulled out my penis.

Q. I know we know you never said you did it. We are saying you did? Did do it?

A. That is what you'll are saying[?]

Q. And you are harping on the fact that yea I did it but nobody want to press no charges, that's what your harping on that you think (INAUDIBLE) right?

A. What time did the incident say? Look on the piece of paper and tell me what time the incident say?

Q. It is the reverse process sir. I get to ask you questions, you get to tell the answers. You had questions asked to you, I am asking you questions.

A. You asked me questions, I, I'm not I'm telling you what know.

Q. Okay. Let's, let's stop that line of questioning. You remember going meet with Dr. Lonowski when you were at Crossroads?

A. Yes, sir.

Q. Okay. You remember some of the things you told Dr. Lonowski?

A. Yes, sir.

Q. You remember telling Dr. Lonowski on that date you showed some meat?

A. Oh me.

Q. Yes, sir.

A. (INAUDIBLE)

Q. That you been smoking weed since you were nine years old almost everyday correct?

A. Yea.

21

Q.      Since you were nineteen years old right?

A.      Yea.

Q.      You remember telling Dr. Lonowski well I smoked weed that day and I it just happened right?

A.      What happened?

Q.      That you committed the offense. That you went to Ms. [A.R.'s] home.

A.      I told you I went there that day but why you going to tell, when I am fixing to tell you what else I told the doctor.

Q.      You also told the doctor, you remember telling the doctor that you have been guilty of committing some other crimes?

A.      What crimes?

Q.      Criminal Damage to Property, a felony. You remember telling him that?

A.      I don't remember telling you that.

Q.      Dr. Lonowski, not me. You remember telling that to the doctor?

A.      (NO VERBAL RESPONSE)

Q.      You don't remember telling that to the doctor?

A.      He probably put the charges on that a (INAUDIBLE). I was telling my mama that (INAUDIBLE).

Q.      You remember telling him about you on medication?

A.      Yea.

Q.      So you knew you were on medication right, you knew you had to take medication right?

A.      Yes, I am on medication.

Q.      Because you have a behavioral problem right?

A.      Yea.

Q.		You don't listen to your mama when she tells you things?

A.		I do listen to her.  She doesn't want to listen to me.

Q.		She don't want to listen to you.  Okay.  Was she the one taking the medicine or you the one that has to take the medicine?

A.		Me.

Q.		All right.  You remember some other charges?

A.		Yea, put on me.

Q.		No not he put on you?

A.		Yes, he did.

Q.		You remember telling him about your thoughts Dr. Lonoswki that you think?

A.		Suicide, stuff like that.

Q.		No, let's talk about the other stuff though?

A.		Like what.

Q.		Your right eye.  The image that comes out of your right eye when you see a black male with white stuff coming out of his mouth.  You remember telling him that?

A.		Told him, I told him I see stuff like that.

Q.		Yea, he also told you, you believe that white stuff was sperm.  You remember telling him that?

A.		About others.  About others. . .

Q.		About a black male coming out of your right eye.  You remember telling him that?

A.		No, sir.

Q.		Selected memory loss again uh.  He says sometimes a man's private parts is (INAUDIBLE) he says this disturb you.  It's the private parts out of the left eye too?

A.		No, sir.

23

Q.      Dr. Lonowski wouldn't be telling the true if he said you said those things?

A.      I probably said them but I don't remember.  I was (INAUDIBLE).

Q.      And you want this jury to believe that Ms. [A.R.] made up this story about you correct?  That she is lying that day and that you are the one that is telling the truth?

A.      Yes, sir.

Q.      You want the jury to believe that your mama was lying when she said that you . . .

A.      Oh, excuse me.  Before, before you go so, go any further, my mama when she just left this thing she said, she say no charges weren't pressed on me.

Q.      And I heard Detective Jeansonne and your mama said that you apologized to her for, for being brought to the Bunkie Police Department.  That you came clean.  You heard her confess that you came clean?

A.      Yea.

Q.      And that you, you apologized to her?

A.      Yea.  I apologized to my mama about my ways towards her though.

Q.      You knew what you had done that night didn't you Mr. [C.]?

A.      I don't do nothing.

Q.      You know full well what you done that night don't you?

A.      I told you. . .

Q.      You took out, you took out your penis and you masturbated in front of Ms. [A.R.] and her children and you knew that was wrong didn't you?  That is why you ran home to mama.  Your mama testified that you hadn't been home all day. . .

ALL TALKING AT THE SAME TIME.

24

Q.     You heard your mama testify you hadn't been home all day?  But certainly after you committed this act then you run to mama . . .

A.     I don't know.  Let me talk.  Listen, I was about to tell you this Ms. [A.R.] (INAUDIBLE).

Q.     You been needing your mama to protect you all your life haven't you?

A.     (INAUDIBLE).

Q.     But you don't call mom when you are smoking marijuana do you?

BY MR. WHITTINGTON:

(INAUDIBLE) finish his answer.

BY THE COURT:

All right.

BY MR. [C.]

A.     I try to tell her . . .

BY THE COURT:

Go ahead with your response.

BY MR. [C.]:

A.     I tried to tell her I was (INAUDIBLE) house.

(INAUDIBLE).

Q.     You smoked weed all day long at the (INAUDIBLE) house.  You told Dr. Lonowski you smoke weed and marijuana all day?

A.     No, I can't smoke at their house.

BY MR. GREENHOUSE:

Those are all the questions I have.

25

BY THE COURT:

Re-direct.

BY MR. WHITTINGTON:

Nothing, Your Honor.

More bizarre behavior was exhibited by the Defendant at the hearing on his post-trial motions and arraignment as a habitual offender. Also, comments of the trial court at these hearings reflect that the trial court was cognizant of the Defendant's mental deficits and that he was mentally incompetent to some degree.

First, the Defendant interrupted the proceeding, as follows:

BY MR. [C.]:

Say uh, can I talk to you Mr. Jeansonne[?]

BY THE COURT:

No, I want you to only talk to your attorney okay Mr. [C.]

BY MR. [C.]:

He ain't trying to help me.

BY THE COURT:

Yea, he is trying to help you. He is doing a very good job.

BY MR. [C.]:

Hey, don't you know I, now, put the people behind the that was a couple of weeks ago, a couple of months ago I been in Winnsboro the day I suppose to be up here for trial what October 9th, that was my trial date.

BY THE COURT:

We had a trial right. We had a trial.

BY MR. [C.]:

And my name was on there[?]

BY THE COURT:

Yes.

BY MR. [C.]:

[C. C.] and I wouldn't here.  You know why I didn't come?

BY THE COURT:

You were here for your trial.

BY MR. [C.]:

Don't you know what I am going through in Winnsboro?

BY THE COURT:

Yea, I could imagine.  I . . .

BY MR. [C.]:

You could imagine that when you imagine what is going on right now in this courthouse right.

BY THE COURT:

I told you. . .

BY MR. [C.]:

All my life and the law that was now, I could show you something in this rule book, this law book right here.

BY THE COURT:

Don't touch the books okay.

BY MR. [C.]:

I want to show you something that I know.

BY THE COURT:

Mr. [C.], you have an attorney.  He has done a very good job for you.  Somebody gave . . .

BY MR. [C.]:

Do you know I'm, I'm the type like you remember what you said about last time about the higher stuff, that's what I am. He ain't got no understanding, nothing show right now that this being (INAUDIBLE) forgetting you know what that means. My privacy.

BY THE COURT:

I'm not sure how much . . .

BY MR. [C.]:

So, so you understand . . .

ALL TALKING AT THE SAME TIME.

BY THE COURT:

What happened in your case is . . .

BY MR. [C.]:

About how rules and regulations. . .

BY THE COURT:

What happened to you in this case. . .

BY MR. [C.]:

You got to go by the book.

BY THE COURT:

What happened in this case is that you, you barged into someone's house . . .

BY MR. [C.]:

No, no, no, that, that was . . .

BY THE COURT:

No, that was you.

BY MR. [C.]:

You'll against me in the court of law.

ALL TALKING AT THE SAME TIME.

BY THE COURT:

That is what the woman testified to and that you exposed yourself to her and her children Mr. [C.] and you did some other things in front of her and her children.
BY MR. [C.]:

No, no.

BY THE COURT:

Yea, and you held the door open. . .

BY MR. [C.]:

And that, that was so where she at now?

BY THE COURT:

And you have an attorney. . .

ALL TALKING AT THE SAME TIME.

BY MR. [C.]:

I have been locked up three years and you say I was . . .

BY THE COURT:

She, she testified in front of a jury . . .

BY MR. [C.]:

I am trying to get them to listen. I don't know quite, not know what I am talking about and everything else.

BY THE COURT:

Go ahead and restrain him deputy.

The Defendant's post-trial motions were then denied.

Lastly, the Defendant was arraigned on the habitual offender bill. The trial court attempted to explain the charge to the Defendant and the following conversation

29

with the Defendant ensued:

BY THE COURT:

All right, Mr. [C.] if you will step back up by your attorney. All right, Mr. [C.] the State has proceeded to try to [sic] you as a habitual offender, a second offender okay. You have been afforded an attorney, Counselor Whittington okay. You understand that?

BY MR. [C.]:

A habitual offender what you mean by that[?] It's no understand.

BY THE COURT:

All right, there has been a denial.

BY MR. [C.]:

So I been in a denial, I understand, I understand you'll denying me.

After finding the Defendant to be a habitual offender, the trial court expressed to defense counsel that it felt sorry for the Defendant and indicated that he would have someone check to see if there was some type of program available to the Defendant through the Department of Corrections (DOC). The trial court also stated that it wished there was a good treatment facility for the Defendant that could house him and that perhaps the Defendant could be transferred once he is in the DOC to East Feliciana Hospital in Jackson or to a similar facility.

At sentencing, the trial court indicated that it was not able to send the Defendant to Jackson. Because the court was limited in where it could send the Defendant, defense counsel requested that, wherever it decided to send the Defendant, the court be sure to recommend that the Defendant be put back on the medication and that he follow a strict regimen. Defense counsel also requested, once more, that the trial court take into consideration Dr. Lonowski's report indicating the possibility that

30

the Defendant had diminished capacity at the time of the offense and the fact that, when medicated, the Defendant's behavior problems were manageable. The Defendant then interrupted his attorney as follows:

BY MR. [C.]:

Excuse me, can I talk to you[?] Excuse me, can I say something Your Honor[?]

BY THE COURT:

Talk to your lawyer.

BY MR. [C.]:

Can I say something[?] I have been locked up three years. Three years and seven months. You just said, you just said in order for me to get some medication. You understand what my mama just said[?] You understand what you told the judge[?] I been locked up three years and seven months right. That's credit for time served (INAUDIBLE). How am I going to get some medication in the jail house[?] The jail house ain't going to give me no medication.

BY MR. WHITTINGTON:

I'm asking the judge to recommend that wherever you are, you get the medication.

BY MR. [C.]:

They ain't going to get it to me. That's what I am trying to tell you. That's ain't going to work in a correctional. If I go. . .

ALL TALKING AT THE SAME TIME.

BY MR. [C.]:

I ain't never been to trial.

When defense counsel rested, the Defendant interrupted once more:

BY MR. [C.]:

Excuse me.

BY THE COURT:

You have to talk to your lawyer okay.

BY MR. [C.]:

Excuse me, he just said I had a good record. No need saying all, all these other things that you don't, you, if you could excuse me for a second let me talk to you. Ask him to repeat what he just said. This man right here . . .

BY THE COURT:

I have already got your record in front of me.

BY MR. [C.]:

All right, if you got my record, I came to court, I've been coming to court and I am about to tell you this here. Last time I didn't come to court because I was (INAUDIBLE) facility. Do you know what I am going through right now[?]

BY THE COURT:

Right, right.

BY MR. [C.]:

Do you know what I am going through right now with my family?

BY THE COURT:

Yes.

BY MR. [C.]:

Now, do you know who may [sic] family really is?

BY THE COURT:

Yea.

BY MR. [C.]:

Now, I can tell you something[?] But what you, what you understanding . . .

ALL TALKING AT THE SAME TIME.

BY THE COURT:

Everybody goes through it.  Nobody likes it.

BY MR. [C.]:

Can I talk, can I say something for a second[?]

BY THE COURT:

Nobody likes state prison.  Now go ahead and have a seat so I can finish up here.  Nobody likes to go to prison.  Okay.

BY MR. [C.]:

What, what I'm say.

BY THE COURT:

Sit down so I can finish up okay.

BY MR. [C.]:

I was talking to you.

BY THE COURT:

Yea, I have already heard all of the arguments.

BY MR. [C.]:

It's not no arguments.  I'm trying to see do you understand me cause.  All right, everything that goes on in this courthouse I got sit down, back there, look at you'll, criticize me, now I am up here.  Now all I'm, all I'm trying to tell you'll holding something against me in the court of law.

BY THE COURT:

Okay.  All right, I understand your argument.  There is no prejudice here.

BY MR. [C.]:

I ain't saying it's prejudice.

BY THE COURT:

We are not talking about you, I don't mean in that way, any bias against you. I mean talking about you. We are not talking about you when you are not up. We talk about you when your case is called up. Okay.

BY MR. [C.]:

You talk about me when my case ain't called up. So, so, so, so, nobody one of these, one of these D.A.'s ain't tell you me to release[?] You ain't agree me to release credit for time served. I have been fighting this same charge since 2004.

BY THE COURT:

Okay, sit down.

BY MR. [C.]:

Last time, Bridgett Brown was my lawyer she said release me.

BY THE COURT:

Okay, sit down. That was her argument. All right, anything else counselors?

BY MR. WHITTINGTON:

I think I would say in response to Mr. [C.'s] comments I don't want it to be perceived or thought that I in anyway trying to make light of the situation in no way, shape or form do I think that this is something that we could just let go by. The only thing that I am trying to make, the only point I am trying to make is that at some point (INAUDIBLE) Mr. [C.] will get out of prison and the question is when he does get out what will he be when he gets out. If there is anything that can be [done] in the meantime while he is incarcerated to help make him better, I would much rather see that happen then to just send him away somewhere and then get out and be a form [sic] more threat to society [than] what he may or may not be now.

BY MR. [C.]:

I am going to ask anybody in here if I am a threat to them if they saw my reactions in court just now.

BY THE COURT:

Okay.

BY MR. [C.]:

Anybody, you'll think I am threat[?]

BY THE COURT:

Quite [sic] down.  Quite [sic] down.

BY MR. [C.]:

Do you think I am a threat?

BY A LADY:

Yea.

BY THE COURT:

Quite [sic] down.  Quite [sic] down.

Next, the trial court reviewed the mitigating and aggravating factors of the Defendant's case until it was interrupted by the Defendant:

BY MR. [C.]:

You say you are going to sentence me?

BY THE COURT:

Yes, I have.

BY MR. [C.]:

I'd rather go to trial.  Why you going to sentence me?  You ain't never give me no plea.

BY THE COURT:

You had your trial.

BY MR. [C.]:

We never had a trial.

35

BY THE COURT:

You rejected a plea and you had your trial okay.

BY MR. [C.]:

You, you remember when I was suppose to come to trial[?] Winnsboro ain't bring me up there.

BY THE COURT:

All right, good luck to you. Good luck to you.

At the hearing on the Defendant's motion to reconsider his sentence, he continued with his unruly behavior and interrupted the proceeding several times. The Defendant continued to maintain that no charges were pressed against him, and the trial court attempted, once more, to explain the progression of the case as follows:

BY MR. [C.]:

Okay. I bet you, I bet, I, I put my life on the line right now. That woman said no charges weren't pressed. I don't know what you'll talked about. You'll, you'll explained, you'll sit here and say you'll knew my whole life and you'll can't tell me no lies.

BY THE COURT:

She testified. She testified. . .

BY MR. [C.]:

No, she, you'll knew, you'll knew she, you'll knew she, she testified and said this release wasn't no charges were pressed. Now, what type, what type of charge they got me on[?]

BY THE COURT;

Okay, there were charges filed and . . .

BY MR. [C.]:

They say exposing, that's really, that's really credit for time served. I know what this woman told me.

36

BY THE COURT:

It was a felony sex offense. The charges, the charges were taken by the police and then they were forwarded to the D.A. and the D.A. did, they prosecuted it.

BY MR. [C.]:

I don't know what the charge, where the D.A. at[?]

BY THE COURT:

You had a trial.

BY MR. [C.]:

I ain't never went to trial. The trial will be in there with Judge Bennett.

BY THE COURT:

No, no, the trial was in here.

BY MR. [C.]:

We been here by our self.

ALL TALKING AT THE SAME TIME.

BY THE COURT:

No, no the trial was in here.

BY MR. [C.]:

2004, I was going, I was waiting to go trial on the same thing.

BY THE COURT:

I understand but whatever it happens, it happened but we had a trial in here. Okay.

BY MR. [C.]:

I'm saying, I think I, I think I deserve a chance.

ALL TALKING AT THE SAME TIME.

37

Defense counsel then stressed that the trial court, on numerous occasions, had seen the Defendant's behavior, and, if the Defendant was incarcerated without receiving help, he would be more of a threat upon his release. In response, the trial court stated: "Whatever happened procedurally [as to] why he didn't get an insanity plea, I don't remember [,] but obviously he didn't get it. Either the doctor did not agree or it was not planned for whatever reason."

The trial court then stated that it had no control over DOC as to how it treats the inmates and that its only choice was to release the Defendant early or keep him off the streets. Meanwhile, the Defendant continuously attempted to interrupt the trial court and interject his comments. The Defendant claimed, again, that he never went to trial and argued with the trial court about its lack of authority over DOC. After the trial court denied his motion to reconsider sentence, the Defendant stated:

BY MR. [C.]:

So how much time, how much time I got[?]

BY THE COURT:

I don't know how much time you got left Mr. [C.] and I hope you get treatment. I know you. . .

BY MR. [C.]:

But I'm saying how much time I got? How much time did you give me?

BY THE COURT:

I don't remember. It was ten years I think.

BY MR. [C.]:

You don't remember how much time you gave me. That's, that's against the law. That is a mere release right there.

BY THE COURT:

I just can't memorize everything. I just can't do it.

ALL TALKING AT THE SAME TIME.

BY MR. [C.]:

I need to file charges for threatening my family. All what he threatened my family, what he said about my family. Criticize my family. It is God's honest truth.

BY THE COURT:

All right, Mr. [C.]. All right, I am not going to raise any issue of direct contempt, let the matter go and move on.

Considering the record and the ruling in *Snyder*, we find that the trial court abused its discretion in its failure to inquire about or to consider the Defendant's psychiatric status at the time of the hearing and in finding that the Defendant was competent to stand trial. Further, considering the specific facts and evidence in this case prior to trial, we find that the trial court had reasonable grounds to doubt the Defendant's mental capacity to proceed and, thus, abused its discretion in failing to re-open the sanity commission and/or order a competency evaluation, *sua sponte*, as required by La.Code Crim.P. art. 643. *See Snyder*, 750 So.2d 832. Lastly, a review of the record affirmatively reflects that the Defendant's mental competency was questionable during trial and the subsequent proceedings. Accordingly, we find that the Defendant was denied a fair trial.

### *Remedy*

The *Snyder* court also addressed the proper remedy after having found that the trial court abused its discretion in failing to investigate the defendant's claims of incompetency. The court stated that "a nunc pro tunc hearing to determine whether defendant was competent at the time of his trial is appropriate if a meaningful inquiry

into the defendant's competency can still be had." *Id.* at 854. The court explained:

> The federal courts of appeals, although noting that retrospective competency hearings are not favored, have allowed nunc pro tunc hearings on the issue of competency if a meaningful inquiry into the defendant's competency can still be had. *See, e.g., Reynolds v. Norris*, 86 F.3d 796 (8th Cir.1996); *Watts v. Singletary*, 87 F.3d 1282 (11th Cir.1996); *United States v. Renfroe*, 825 F.2d 763 (3rd Cir.1987); *Zapata v. Estelle*, 588 F.2d 1017 (5th Cir.1979). The trial court is in the best position to determine whether it can make a retrospective determination of defendant's competency during his trial and sentencing. *Renfroe*, 825 F.2d at 767. The determination of whether a trial court can hold a meaningful retrospective competency hearing is necessarily decided on a case-by-case basis. *Miller v. Dugger*, 838 F.2d 1530 (11th Cir.1988). The State bears the burden to show the court that the tools of rational decision are available. *Lokos v. Capps*, 625 F.2d 1258 (5th Cir.1980).
>
> A "meaningful" determination is possible "where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." *Reynolds*, 86 F.3d at 802. Additionally, "[w]hen determining whether a meaningful hearing may be held, we look to the existence of contemporaneous medical evidence, the recollections of non-experts who had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records. The passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." *Reynolds*, 86 F.3d at 803 (citations omitted). The court in *Miller v. Dugger*, 838 F.2d 1530 (11th Cir.1988) noted that it had never given the district courts a list of factors that must be met in order to determine that a nunc pro tunc determination of competency is possible, but stated that relevant factors include time, availability of witnesses and the existence of evidence on the state record about the defendant's mental state at the time.

*Id*. at 855 (footnote omitted).

In the instant case, however, we find that a nunc pro tunc competency hearing would not likely rectify the trial court's error in failing to make further inquiry into the Defendant's competency prior to trial. Unlike the defendant in *Snyder*, the Defendant's competency was not evaluated at or near the time of trial to allow for a meaningful determination. As such, the record is void of relevant evidence to permit

40

an accurate assessment of the Defendant's competency at the time of trial. Accordingly, the Defendant's conviction and sentence are reversed and set aside, and the case is remanded to the trial court for a new trial.

## DISPOSITION

In this case, the Defendant was denied a fair trial due to the trial court's failure to inquire about the Defendant's psychiatric status, its failure to even consider the Defendant's psychiatric status at the time of the sanity commission hearing, and in concluding that the Defendant was competent to stand trial. Additionally, considering the facts in this case, the trial court erred in denying the Defendant's request for Appointment of Psychiatric/Psychological Expert. Accordingly, the Defendant's conviction and sentence are reversed and set aside, and the case is remanded to the trial court for a new trial.

**CONVICTION AND SENTENCE REVERSED; CASE REMANDED FOR NEW TRIAL.**